```
 1   15:35:10   created?

 2   15:35:10      A.   It came on the same, 6/14/2002,

 3   15:35:16   submission.

 4   15:35:18      Q.   And how do you know that?

 5   15:35:18      A.   It is stamped and dated on the bottom

 6   15:35:20   of the form with a TMR date and VCN number.

 7   15:35:30      Q.   And turning back to Exhibit 2, can you

 8   15:35:34   tell us why Starmark's receipt of these two

 9   15:35:36   documents on June 14th is not noted on the

10   15:35:40   chronological entry document, Exhibit 2?

11   15:35:44      A.   No, sir, I cannot.

12   15:35:44      Q.   Should it have been?

13   15:35:46      A.   I'm sorry?

14   15:35:48      Q.   I said should it have been?

15   15:35:50      A.   Not necessarily because this was

16   15:35:52   closed out.

17   15:35:54      Q.   When was it closed out?

18   15:35:56      A.   Well, this was closed out on 6/6/2002.

19   15:36:00   There was no response.  So we closed it out.

20   15:36:12      Q.   Turning back to Exhibit 2, I will

21   15:36:16   direct your attention to what you were telling

22   15:36:16   me about, events on June 25th.

23   15:36:20      A.   Yes.

24   15:36:22      Q.   Do I understand you correctly:  You

25   15:36:24   are telling us that someone at Starmark
```

31

```
 1   15:36:26   re-sent the documents to the applicant's post

 2   15:36:32   office box, right?

 3   15:36:34      A.   Yes.

 4   15:36:34      Q.   And are you telling us, then, turning

 5   15:36:38   to Exhibit 10, the first page of Exhibit 10,

 6   15:36:42   that that post office box would be the

 7   15:36:46   applicant's post office box as shown on her

 8   15:36:48   application?

 9   15:36:50      A.   Wait a minute.

10   15:36:56           I'm sorry.  Can you repeat that

11   15:36:58   again?  I'm sorry.

12   15:36:58      Q.   Are you telling us that the

13   15:37:00   application would have been returned, then, to

14   15:37:04   the post office box as shown on page 1 of

15   15:37:06   Exhibit 10, that being Box 2643, Bethel?

16   15:37:12      A.   Yes.

17   15:37:12      Q.   And we are agreed that there is no

18   15:37:14   record of those documents being returned to

19   15:37:16   Starmark, correct?

20   15:37:18      A.   Correct.

21   15:37:20      Q.   When Starmark sent these documents

22   15:37:24   back, can you tell us what would have been

23   15:37:28   sent back to an applicant?  Did she get a

24   15:37:36   cover letter or an explanatory letter or just

25   15:37:38   a returned document?
```

| | | |
|---|---|---|
| 1 | 15:37:40 | A.   Actually, it would have been |
| 2 | 15:37:42 | Exhibit 10. |
| 3 | 15:37:44 | Q.   I'm sorry.  Go ahead and describe |
| 4 | 15:37:46 | that.  If the applicant had gotten it, |
| 5 | 15:37:48 | received it, what would have been in there? |
| 6 | 15:37:50 | A.   She would have received a status on |
| 7 | 15:37:52 | new employee addition form, which explains |
| 8 | 15:37:54 | that the group number was missing, and she |
| 9 | 15:37:56 | would have gotten her application returned. |
| 10 | 15:37:58 | Q.   Did it request additional information? |
| 11 | 15:38:02 | A.   It says:  "The processing request has |
| 12 | 15:38:04 | been delayed.  Please correct and return the |
| 13 | 15:38:06 | employee enrollment form for the name of |
| 14 | 15:38:08 | company or group number," and then we |
| 15 | 15:38:10 | handwrote on the bottom:  "Please respond |
| 16 | 15:38:14 | within ten days for consideration."  So we |
| 17 | 15:38:18 | would have just re-sent that to that P.O. Box. |
| 18 | 15:38:22 | Q.   On June 25th? |
| 19 | 15:38:22 | A.   Yes. |
| 20 | 15:38:26 | Q.   Now, these documents that we have |
| 21 | 15:38:32 | discussed so far this afternoon, are these the |
| 22 | 15:38:34 | only documents in Starmark's possession that |
| 23 | 15:38:40 | mention Melissa Virtue? |
| 24 | 15:38:42 | A.   Yes. |
| 25 | 15:38:54 | MR. FAYETTE:  What I'm going to do is, |

```
 1   15:38:56   I think at this point, counsel, I'm going to

 2   15:38:58   ask that we go off record for a minute or two

 3   15:39:00   so we can take a look at our fax machine, so I

 4   15:39:04   can take a look at this exhibit.

 5   15:39:04              So unless there is anybody that

 6   15:39:06   has got any objection, I'm going to ask that

 7   15:39:08   we go off record here for the next couple of

 8   15:39:10   minutes.

 9   15:39:12              MR. JACOBSON:   Okay.  We will leave

10   15:39:12   the phone connected.

11   15:39:14              MR. FAYETTE:   Why don't we leave the

12   15:39:16   phone connected.

13   15:39:16              MR. JACOBSON:   Okay.  We are off

14   15:39:18   record.

15   15:39:20              (Recess taken.)

16   15:42:48   BY MR. FAYETTE:

17   15:42:48       Q.   I have in hand, then, a four-page fax

18   15:42:50   that appears to be Exhibit 10.  I will ask

19   15:42:58   Ms. Wendell to take that up.

20   15:43:00       A.   Okay.

21   15:43:04       Q.   I don't know what page of the

22   15:43:06   exhibit it is, but let's turn to the letter

23   15:43:10   from Mr. Alexander.  It is on Bethel Group

24   15:43:16   Home stationery.

25   15:43:18       A.   Yes.
```

34

```
 1    15:43:20    Q.    Okay.   The date stamp that appears in

 2    15:43:22    the right-hand corner there, May 13th, 2002, I

 3    15:43:24    will direct your attention to that.

 4    15:43:26                 Are you telling us then,

 5    15:43:28    Mr. Wendell, that that's the day that Starmark

 6    15:43:30    received this document?

 7    15:43:30    A.    That was the date received by our mail

 8    15:43:34    services.

 9    15:43:34    Q.    Got it.

10    15:43:34                 Now, below that, there appears to

11    15:43:38    be a line under "Bethel Group Home health

12    15:43:40    plan" and a question mark.  Do you know who

13    15:43:46    added that question mark and that

14    15:43:48    underlineation?

15    15:43:50    A.    No, I do not.

16    15:43:52    Q.    And you are looking at a photocopy or

17    15:43:54    an original?

18    15:43:56    A.    I think it is a photocopy.

19    15:44:06    Q.    Turning to the first page of the

20    15:44:08    employee enrollment form, the one with

21    15:44:14    Starmark's logo in the upper left corner --

22    15:44:16    A.    Yes.

23    15:44:18    Q.    -- below that it says:  "Employer

24    15:44:20    information:   Bethel Group Home."

25    15:44:22    A.    Yes.
```

35

```
1    15:44:22      Q.    And it appears to be in different
2    15:44:24      handwriting than the applicant's biographical
3    15:44:28      information; agreed?
4    15:44:30      A.    Agreed.
5    15:44:30      Q.    Do you know whose handwriting that is
6    15:44:34      where it says "group name"?
7    15:44:36      A.    No, I do not.
8    15:44:36      Q.    Is that the way that Starmark received
9    15:44:38      it, or can you tell us if someone at Starmark,
10   15:44:42      perhaps, added that name to that line?
11   15:44:44      A.    I don't know.
12   15:44:48      Q.    I'm sorry, what was the name of the
13   15:45:02      Starmark person -- was it Ms. Johnson that
14   15:45:04      would have received this?
15   15:45:06      A.    Yes.
16   15:45:06      Q.    Is there any reason that she can't
17   15:45:08      query your data base alphabetically to figure
18   15:45:12      out the group number for Bethel Group Home?
19   15:45:16      A.    We do have that capability; however,
20   15:45:18      depending on how it was entered into the
21   15:45:20      system, sometimes it is difficult to find.
22   15:45:24      Q.    We are agreed, though, there was no
23   15:45:26      record of any attempt to query alphabetically?
24   15:45:30      A.    There is no record of that.
25   15:45:30      Q.    And now I will turn to the one-page
```

```
 1   15:45:34   document that says:  "Status on new employee

 2   15:45:36   addition."  It has got Starmark's name in the

 3   15:45:40   upper left-hand corner.

 4   15:45:40        A.   Yes.

 5   15:45:42        Q.   And then there is a signature at the

 6   15:45:44   bottom, but I can't read it on my copy.  It

 7   15:45:46   says:  "Group administration department."  At

 8   15:45:48   the very bottom is a CC line.  Can you explain

 9   15:45:50   that to us?

10   15:45:50        A.   The CC line, the signature is Melissa

11   15:45:54   Melendez.

12   15:45:54        Q.   And who is Melissa Melendez?

13   15:45:58        A.   Another member of the administration

14   15:46:00   department that handles add-ons.

15   15:46:02        Q.   And where it says here:  "Comments:

16   15:46:04   Please respond within ten days for

17   15:46:06   consideration," where does that ten days come

18   15:46:08   from?

19   15:46:10        A.   That is just a procedural time that we

20   15:46:14   allow insureds to respond back to us, so that

21   15:46:18   we can give them timely response on the

22   15:46:22   request.

23   15:46:22        Q.   But is that a written policy or

24   15:46:24   procedure?

25   15:46:24        A.   No.
```

| | | |
|---|---|---|
| 1 | 15:46:28 | Q.   And looking at the boxes that are |
| 2 | 15:46:30 | checked on this document, are we agreed that |
| 3 | 15:46:34 | the only reason this was returned is because |
| 4 | 15:46:36 | of the box that says name of company or group |
| 5 | 15:46:40 | number? |
| 6 | 15:46:40 | A.   Yes. |
| 7 | 15:46:48 | Q.   We are also agreed that documents |
| 8 | 15:46:52 | submitted with the employee enrollment form |
| 9 | 15:46:54 | clearly identify Bethel Group Home?  We agree |
| 10 | 15:46:58 | about that; don't we? |
| 11 | 15:47:00 | A.   I'm sorry.  Can you repeat that again? |
| 12 | 15:47:02 | Q.   We are agreed that the document |
| 13 | 15:47:04 | submitted with the application, that you |
| 14 | 15:47:06 | received on May 13th, clearly identifies |
| 15 | 15:47:08 | Bethel Group Home, agreed? |
| 16 | 15:47:10 | A.   Yes. |
| 17 | 15:47:12 | Q.   And this form is written -- I'm |
| 18 | 15:47:16 | returning now to the "Status on New Employee |
| 19 | 15:47:18 | Addition" form. |
| 20 | 15:47:20 | The only box that's checked here |
| 21 | 15:47:22 | is name of company or group number, right? |
| 22 | 15:47:24 | A.   Yes. |
| 23 | 15:47:24 | Q.   And that's written in the disjunctive; |
| 24 | 15:47:28 | in other words, doesn't it suffice that |
| 25 | 15:47:32 | Starmark knows the name of the company or the |

```
 1    15:47:34   group number?

 2    15:47:34      A.   Not necessarily.

 3    15:47:36      Q.   But that's all this form asks for,

 4    15:47:38   right?

 5    15:47:38      A.   Yes.

 6    15:47:56      Q.   A question about that:  Why weren't

 7    15:48:00   these documents sent to the employer, in this

 8    15:48:04   case Bethel Group Home?  Can you speak to

 9    15:48:08   that?

10    15:48:08      A.   It is our procedures to return the

11    15:48:10   application to the employee.

12    15:48:14      Q.   Right.  And, again, are those

13    15:48:18   procedures written, or it is just the way that

14    15:48:20   folks are trained?

15    15:48:20      A.   It is just the way they are trained.

16    15:48:26      MR. FAYETTE:  I will ask

17    15:48:26   Mr. Jacobson's assistance to take out some

18    15:48:28   letters that he has with him.  They begin with

19    15:48:34   Exhibit 6.

20    15:48:42      MR. JACOBSON:  Exhibit 6 is a one-page

21    15:48:44   letter dated November 26th, 2002.

22    15:48:50      MR. FAYETTE:  And if Mr. Jacobson

23    15:48:52   would present that to the witness.

24    15:48:54           Can you look at what we have

25    15:48:56   marked at Exhibit 6?
```

```
 1    15:48:58            MR. JACOBSON:  Okay.  The witness is

 2    15:49:00    examining the exhibit.

 3    15:49:02            MR. FAYETTE:  Let me know when you are

 4    15:49:04    done, Ms. Wendell.

 5    15:49:14            THE WITNESS:  Okay.

 6    15:49:16    BY MR. FAYETTE:

 7    15:49:18        Q.    Is this the first time you have seen

 8    15:49:22    this letter dated November 26th?

 9    15:49:24        A.    Yes.

10    15:49:32        Q.    So you have no record of this letter

11    15:49:34    ever having been received by Starmark?

12    15:49:38        A.    Not by Starmark administration.

13    15:49:42        Q.    Well, is the address for Starmark

14    15:49:44    correct on that letter dated November 26th?

15    15:49:46        A.    Yes.

16    15:49:48        Q.    And down to the zip code and the

17    15:49:54    plus-four addition there?

18    15:49:54        A.    Yes.

19    15:49:58        Q.    If a letter like that had been sent to

20    15:50:02    Starmark at 400 Field Drive, Lake Forest,

21    15:50:06    Illinois, with that zip code, do you know

22    15:50:08    where it would have gone?

23    15:50:08        A.    Well, it would not have come to

24    15:50:14    administration because it is dealing with

25    15:50:16    outstanding medical bills.  My area does not
```

```
1    15:50:20    deal with the claims, nor benefits payable.
2    15:50:22    So this probably would have been forwarded on
3    15:50:24    to our benefit area.
4    15:50:30        Q.   And is it possible there are records
5    15:50:32    in that benefit area that you haven't found in
6    15:50:34    your preparation for this deposition?
7    15:50:36        A.   I guess it is possible.  I do not have
8    15:50:40    access to the benefits records.
9    15:50:46        Q.   Well, can you tell us generally what
10   15:50:48    would have happened if the benefits records
11   15:50:50    area had received a letter like that one dated
12   15:50:52    November 26th?
13   15:50:52        A.   I have no idea.
14   15:50:56        Q.   Is it possible the letter would have
15   15:50:58    been discarded without any action at all?
16   15:51:00        A.   You know what?  I don't know.  I would
17   15:51:02    say not.  It is not company policy anywhere to
18   15:51:06    discard letters without taking action, but I
19   15:51:10    can't really speak to that as I don't know.
20   15:51:12        Q.   Where, then, would be the best place
21   15:51:14    to research to see if Starmark has a record of
22   15:51:18    receipt of that letter dated November 26th?
23   15:51:20        A.   I don't know.  I really don't know.
24   15:51:22        Q.   Well, just a moment ago you mentioned
25   15:51:24    the benefits area.  Did I have that right?
```

41

```
 1   15:51:30     A.    Yes, we do have a benefits area.  How
 2   15:51:32   they keep their procedures and files and
 3   15:51:34   letters, I don't know.  I'm not privy to that
 4   15:51:36   information.  So I really couldn't tell you.
 5   15:51:38   I don't know.
 6   15:51:38     Q.    Could you tell us who would be able to
 7   15:51:40   tell us?
 8   15:51:40     A.    I really don't know.
 9   15:51:46     Q.    Do you know the name of the
10   15:51:52   administrator, the people in charge of that
11   15:51:54   area?
12   15:51:54     A.    Oh, gosh.
13   15:51:58          MR. MC DANIEL:  Excuse me, Jay.
14   15:52:02             This is a point that Bernie and I
15   15:52:04   didn't discuss yet.
16   15:52:06          MR. FAYETTE:  Okay, that's fine.
17   15:52:08          MR. MC DANIEL:  But I can tell her, in
18   15:52:10   front of us all, that I contacted our claim
19   15:52:16   office in Jackson, Minnesota, and the claims
20   15:52:18   supervisor that has been identified as a
21   15:52:20   knowledgeable person is Penny Gregory; and
22   15:52:24   when Bernie and I talked this morning, Penny
23   15:52:28   Gregory was one of the people that she would
24   15:52:30   have contacted at our claim office, and that
25   15:52:32   is the person that has been designated by the
```

| | | |
|---|---|---|
| 1 | 15:52:34 | claim office to answer any questions you might |
| 2 | 15:52:36 | have on this case. |
| 3 | 15:52:36 | MR. FAYETTE:  Okay.  I will take that. |
| 4 | 15:52:40 | BY MR. FAYETTE: |
| 5 | 15:52:40 | Q.   But are you telling us, Ms. Wendell, |
| 6 | 15:52:42 | that you, in preparation for this deposition, |
| 7 | 15:52:44 | have not researched the benefit area or the |
| 8 | 15:52:48 | claims area for records regarding Ms. Virtue? |
| 9 | 15:52:52 | Is that correct or not? |
| 10 | 15:52:52 | A.   That's correct.  That is beyond my |
| 11 | 15:52:54 | authority. |
| 12 | 15:52:54 | Q.   Understood.  Understood. |
| 13 | 15:52:56 | Can we talk now about new |
| 14 | 15:53:00 | enrollee procedures? |
| 15 | 15:53:00 | A.   Sure. |
| 16 | 15:53:02 | Q.   Can you tell us how new enrollee |
| 17 | 15:53:06 | procedures work for employees who are |
| 18 | 15:53:08 | enrolling under the Bethel Group Home policy |
| 19 | 15:53:12 | number?  And I guess I would ask you to start |
| 20 | 15:53:14 | with what's the enrollee required to do, and |
| 21 | 15:53:16 | then I will go from there. |
| 22 | 15:53:18 | A.   Well, the employer, as the |
| 23 | 15:53:20 | administrator, it is his responsibility to |
| 24 | 15:53:22 | advise the employee of their rights and submit |
| 25 | 15:53:24 | a written enrollment form to Starmark for |

43

| 1 | 15:53:28 | consideration for coverage. |
| 2 | 15:53:30 | Q. Okay. So what is the enrollee |
| 3 | 15:53:42 | required to do in addition to filling out the |
| 4 | 15:53:46 | application? |
| 5 | 15:53:46 | A. Filling out the application is their |
| 6 | 15:53:50 | total responsibility. |
| 7 | 15:53:50 | Q. Can you tell us about processing time |
| 8 | 15:53:54 | for consideration? That implies to me that |
| 9 | 15:53:58 | there is a period of time where Starmark needs |
| 10 | 15:54:00 | to review an application. |
| 11 | 15:54:00 | A. It depends on if the application has |
| 12 | 15:54:02 | been completed with full detail that has been |
| 13 | 15:54:06 | requested. If the application is complete, |
| 14 | 15:54:10 | and has total information, then we process our |
| 15 | 15:54:14 | applications in 24 hours. |
| 16 | 15:54:18 | Q. And then can you speak to effective |
| 17 | 15:54:20 | date of coverage? |
| 18 | 15:54:22 | A. It depends on the group's waiting |
| 19 | 15:54:24 | period as to when effective date of coverage |
| 20 | 15:54:28 | is given. |
| 21 | 15:54:30 | Q. And do you know what the waiting |
| 22 | 15:54:30 | period is for the Bethel Group Home under this |
| 23 | 15:54:34 | policy number? |
| 24 | 15:54:34 | A. Ninety days. |
| 25 | 15:54:38 | Q. All right. Can you explain |

44

| | | |
|---|---|---|
| 1 | 15:54:48 | preexisting condition limitations? |
| 2 | 15:54:52 | A.   If an employee is considered timely, |
| 3 | 15:54:58 | which means that they have signed their |
| 4 | 15:55:02 | application within their 90-day waiting |
| 5 | 15:55:04 | period, plus the 31-day enrollment period, and |
| 6 | 15:55:08 | that application is signed and complete, they |
| 7 | 15:55:10 | will be given an effective date of the first |
| 8 | 15:55:14 | of the month following the date of that |
| 9 | 15:55:16 | application.  They will be preempt 12 months, |
| 10 | 15:55:26 | and then given credit for prior coverage |
| 11 | 15:55:30 | against those 12 months if they are timely. |
| 12 | 15:55:34 | If they are late, it is 18 |
| 13 | 15:55:36 | months, and we give them credit for any prior |
| 14 | 15:55:40 | time served or prior coverage that they have |
| 15 | 15:55:44 | had. |
| 16 | 15:55:44 | Q.   I want you to assume, then, that |
| 17 | 15:55:46 | Starmark had received -- did you know that the |
| 18 | 15:55:48 | date that appears on Ms. Virtue's application |
| 19 | 15:55:50 | is April 17th, 2002? |
| 20 | 15:55:52 | A.   Yes. |
| 21 | 15:55:54 | Q.   That's the one that you received on |
| 22 | 15:55:56 | May 13th? |
| 23 | 15:55:56 | A.   Yes. |
| 24 | 15:55:58 | Q.   If Starmark had received that |
| 25 | 15:56:08 | application in April of 2002, what would have |

45

| | | |
|---|---|---|
| 1 | 15:56:10 | been the first day of coverage for Ms. Virtue |
| 2 | 15:56:14 | in this case? |
| 3 | 15:56:14 | A.   Ms. Virtue's date of hire was |
| 4 | 15:56:16 | January 21st of 2002.  Ninety days later is |
| 5 | 15:56:24 | April 21st of 2002.  She signed her |
| 6 | 15:56:26 | application on April 17th.  She was in her |
| 7 | 15:56:28 | 90-day waiting period.  If she had not checked |
| 8 | 15:56:30 | that she had waived coverage, we would have |
| 9 | 15:56:34 | given her a May 1st effective date, and given |
| 10 | 15:56:36 | her credit for the fact that she had coverage |
| 11 | 15:56:42 | with Aetna starting March -- oh, that's kind |
| 12 | 15:56:54 | of strange. |
| 13 | 15:56:56 | We would have questioned whether |
| 14 | 15:56:58 | or not we would have given her credible |
| 15 | 15:57:00 | coverage.  Her proof of prior coverage states |
| 16 | 15:57:06 | that her effective date of her prior coverage |
| 17 | 15:57:08 | was March of 2002; she was applying April 17th |
| 18 | 15:57:14 | of 2002, but she says it terminated November |
| 19 | 15:57:18 | 26th of 2002. |
| 20 | 15:57:20 | So if we would have processed |
| 21 | 15:57:20 | this application, we would have questioned |
| 22 | 15:57:22 | whether or not she would have gotten prior |
| 23 | 15:57:26 | credible coverage due to the dates that she |
| 24 | 15:57:28 | has given us on her application. |
| 25 | 15:57:30 | Q.   You would have requested additional |

| | | |
|---|---|---|
| 1 | 15:57:32 | information? |
| 2 | 15:57:32 | A.   Yes. |
| 3 | 15:57:32 | Q.   Assume that date, that November 2002 |
| 4 | 15:57:36 | date, is incorrectly written.  Assume that it |
| 5 | 15:57:38 | is really November 26th, 2001.  Then explain |
| 6 | 15:57:42 | the effect on prior credible coverage. |
| 7 | 15:57:44 | A.   Well, I can't, because then she would |
| 8 | 15:57:46 | have more than a 60-day gap in coverage, and |
| 9 | 15:57:50 | she wouldn't get any credible coverage.  You |
| 10 | 15:57:52 | can't have more than a 60-day gap in coverage |
| 11 | 15:57:56 | to get your credible coverage.  If you do, you |
| 12 | 15:57:58 | don't get it. |
| 13 | 15:57:58 | Q.   So how would that affect preexisting |
| 14 | 15:58:00 | condition? |
| 15 | 15:58:00 | A.   She would have 12 months of |
| 16 | 15:58:02 | preexisting because she would not get any |
| 17 | 15:58:06 | reduction of that preexisting as a timely |
| 18 | 15:58:08 | enrollee. |
| 19 | 15:58:10 | Q.   Now, a moment ago, you just said her |
| 20 | 15:58:12 | date of hire was January 21st of 2002.  I am |
| 21 | 15:58:16 | assuming you were just repeating the date that |
| 22 | 15:58:18 | appears on the face of the application? |
| 23 | 15:58:20 | A.   That's all I can repeat is the |
| 24 | 15:58:20 | information she has provided on this |
| 25 | 15:58:22 | application. |

```
 1   15:58:24    Q.    Okay.  Can you explain how claims are
 2   15:58:32    handled under this policy?
 3   15:58:34    A.    No, I cannot.
 4   15:58:34    Q.    You may have already answered this:
 5   15:58:42    Who would be the person who could?
 6   15:58:42    A.    I believe that Steve stated that Penny
 7   15:58:46    Gregory would be your contact as far as
 8   15:58:46    benefits and how they are paid if there was
 9   15:58:48    coverage under this policy.
10   15:58:50    Q.    I think you are right.
11   15:58:52          Do you recognize her as someone
12   15:58:54    that works in Jackson, Minnesota?
13   15:58:56    A.    Yes.
14   15:59:02    Q.    To what degree are you able to discuss
15   15:59:10    processing of claims where preexisting
16   15:59:12    conditions are at issue?
17   15:59:14    A.    Unfortunately, I am not able to
18   15:59:16    discuss the processing of claims in general.
19   15:59:18    I do not get involved and do not have any
20   15:59:20    knowledge of how that happens.  I am not
21   15:59:22    familiar with the handling of that and how the
22   15:59:26    systems work there.
23   15:59:26    Q.    You would defer those questions to
24   15:59:28    Ms. Gregory?
25   15:59:30    A.    Yes.
```

48

| | | |
|---|---|---|
| 1 | 15:59:32 | Q.    Likewise, on Exhibit 10, that you have |
| 2 | 15:59:40 | before you, if you look at -- it might be on |
| 3 | 15:59:44 | page 2 on your copy -- the questions that |
| 4 | 15:59:48 | relate to preexisting conditions, where the |
| 5 | 15:59:50 | applicant is asked about that sort of thing. |
| 6 | 15:59:50 | A.    Yes. |
| 7 | 15:59:56 | Q.    And I'm referring to the Section A. |
| 8 | 16:00:04 | It says: "Medical Information, Section A," |
| 9 | 16:00:06 | and in Question 1 the applicant is asked a |
| 10 | 16:00:08 | series of questions that begin with back and |
| 11 | 16:00:10 | colon, tumor/cancer, and such. |
| 12 | 16:00:10 | A.    Yes. |
| 13 | 16:00:14 | Q.    If I were to ask you questions, |
| 14 | 16:00:16 | Ms. Wendell, about, in the enrollment process, |
| 15 | 16:00:18 | what happens if there is positive responses to |
| 16 | 16:00:20 | any of these, could you speak to that? |
| 17 | 16:00:22 | A.    Yes. |
| 18 | 16:00:24 | Q.    Okay.  Go ahead, then.  Assume that an |
| 19 | 16:00:26 | applicant makes a positive response to |
| 20 | 16:00:30 | Section A, Question 1; back, colon, |
| 21 | 16:00:34 | tumor/cancer, some such thing. |
| 22 | 16:00:36 | A.    We have medical questionnaires that we |
| 23 | 16:00:38 | would either send them or make a phone call |
| 24 | 16:00:40 | and ask them to complete.  We use that |
| 25 | 16:00:42 | information purely for gathering data.  We |

| | | |
|---|---|---|
| 1 | 16:00:48 | cannot decline coverage.  You know, all |
| 2 | 16:00:50 | coverage is guaranteed.  So it is not used for |
| 3 | 16:00:56 | any type of declination of coverage.  It is |
| 4 | 16:00:58 | used basically for information on experience. |
| 5 | 16:01:04 | Q.   Well, how does that match with the |
| 6 | 16:01:06 | information you told me about periods of |
| 7 | 16:01:08 | credible coverage? |
| 8 | 16:01:10 | A.   I don't understand the question.  I'm |
| 9 | 16:01:12 | sorry. |
| 10 | 16:01:12 | Q.   I thought you said just a moment ago |
| 11 | 16:01:14 | that you can't deny coverage. |
| 12 | 16:01:16 | A.   We can't deny issuing coverage, but |
| 13 | 16:01:20 | there are preexisting limitations that are |
| 14 | 16:01:22 | allowed by state law.  As long as you have a |
| 15 | 16:01:26 | timely enrollee, you are allowed to have a |
| 16 | 16:01:30 | preexisting clause, which we do. |
| 17 | 16:01:32 | Q.   Which would have what effect, then, on |
| 18 | 16:01:36 | treatment for that condition? |
| 19 | 16:01:36 | A.   I don't know how they pay that.  I do |
| 20 | 16:01:40 | know that you do have the ability to have |
| 21 | 16:01:44 | preexisting. |
| 22 | 16:01:52 | Q.   Do you know the effect on enrollment |
| 23 | 16:01:54 | if an applicant provides incomplete |
| 24 | 16:02:00 | information on this section, this section |
| 25 | 16:02:02 | about medical history? |

| | | |
|---|---|---|
| 1 | 16:02:04 | A.    If they do not answer |
| 2 | 16:02:08 | questions -- well, it depends on your size of |
| 3 | 16:02:12 | the group.  As you know, Section B says the |
| 4 | 16:02:14 | questions to all individuals for groups with |
| 5 | 16:02:16 | less than ten medical lives and all new |
| 6 | 16:02:20 | enrollees in force. |
| 7 | 16:02:20 | So depending on where you fall |
| 8 | 16:02:22 | into this category, we would ask you to fill |
| 9 | 16:02:24 | in Questions 1 through 5 or 6 and 7 depending |
| 10 | 16:02:28 | on what size group you are. |
| 11 | 16:02:28 | If they are not all completed, |
| 12 | 16:02:30 | depending on what category you fall into, we |
| 13 | 16:02:34 | will return that application and ask you to |
| 14 | 16:02:34 | complete those.  We will not process the |
| 15 | 16:02:36 | application without the completion of this |
| 16 | 16:02:38 | form. |
| 17 | 16:02:38 | Q.   You mentioned a medical questionnaire. |
| 18 | 16:02:42 | Can you explain that to me? |
| 19 | 16:02:44 | A.   They are just basic medical |
| 20 | 16:02:46 | questionnaires.  Let's say, for instance, that |
| 21 | 16:02:48 | someone had diabetes.  This medical |
| 22 | 16:02:52 | questionnaire just asks more information.  If |
| 23 | 16:02:56 | somebody checked diabetes, they would ask more |
| 24 | 16:02:58 | information, like are you on medication or |
| 25 | 16:03:00 | what kind of medication.  They would just ask |

```
 1   16:03:02   them more specifics about what they checked
 2   16:03:04   that they did not tell us on this form.
 3   16:03:06       Q.   And what about on the form where it
 4   16:03:08   says you may receive a call from the home
 5   16:03:10   office?  Can you explain that?
 6   16:03:14                 It is on the right side,
 7   16:03:14   underneath the big blank section.
 8   16:03:18       A.   Okay.  I see it.
 9   16:03:18       Q.   Do you know about that?
10   16:03:20       A.   Yes.  We would use that if we had to
11   16:03:22   ask them information about their medical
12   16:03:28   diagnosis or treatment that they have stated
13   16:03:32   there when they are doing any type of
14   16:03:34   underwriting.
15   16:03:34       Q.   Well, why would you do that?  Why
16   16:03:36   would people at the home office take that step
17   16:03:38   to ask more information?
18   16:03:40       A.   Why?
19   16:03:42       Q.   Yes.  Why?  What's the purpose?
20   16:03:44       A.   Because we use that for our experience
21   16:03:48   purposes.  We need to know what type of
22   16:03:52   medical conditions we have that are expected
23   16:03:54   on a group.
24   16:04:00       Q.   Well, would that information be used
25   16:04:02   to evaluate preexisting conditions?
```

52

1    16:04:04    A.    We do not use that, no.  I mean, I

2    16:04:08    don't on this end use it in administration.

3    16:04:12    Our basic, with preexisting, is it is a basic

4    16:04:14    rule:  You have 12 or 18 months, depending on

5    16:04:18    whether you are timely or late, and depending

6    16:04:20    on what state you are in.  Some states have

7    16:04:22    shorter or longer preexisting rules depending

8    16:04:26    on their legislation, but preexisting is not

9    16:04:30    set based on the type of medical condition you

10   16:04:34    have.  State law doesn't allow that.  State

11   16:04:36    law only allows you to set preexisting on

12   16:04:40    their statutes, and what they have, and

13   16:04:42    whether you are late or timely.

14   16:04:42    Q.    Well, does the information in

15   16:04:44    Question 6 or 7 affect how claims evaluates

16   16:04:48    preexisting condition?

17   16:04:48    A.    I can't answer that question.  I don't

18   16:04:50    know.

19   16:05:14    Q.    Do you know where Starmark has a

20   16:05:16    written definition of the term "preexisting

21   16:05:18    condition" in your policy or procedure manual?

22   16:05:24    A.    I believe there might be a definition

23   16:05:26    in your certificate of insurance.

24   16:05:28    Q.    Okay.

25   16:05:28    A.    If I can find it.

53

| | | |
|---|---|---|
| 1 | 16:05:36 | You might want to turn to your |
| 2 | 16:05:42 | Exhibit 9, certificate of insurance.  It is |
| 3 | 16:05:50 | actually page 9, and there is also a |
| 4 | 16:05:54 | definitions page, I guess 39.  There is a |
| 5 | 16:06:00 | definition of a preexisting condition on that |
| 6 | 16:06:02 | page, and there is also the benefit |
| 7 | 16:06:04 | limitations for preexisting conditions. |
| 8 | 16:06:08 | It tells you that no benefits |
| 9 | 16:06:08 | will be paid for any condition specifically |
| 10 | 16:06:10 | excluded from coverage by elimination rider, |
| 11 | 16:06:12 | which we don't rider anymore, but benefits for |
| 12 | 16:06:16 | covered expenses that result from care or |
| 13 | 16:06:18 | treatment of preexisting condition will not be |
| 14 | 16:06:20 | considered as covered charges until the early |
| 15 | 16:06:22 | of 12 months or 18 months if you are a late |
| 16 | 16:06:26 | enrollee. |
| 17 | 16:06:26 | I'm kind of paraphrasing, but it |
| 18 | 16:06:28 | is in your certificate of insurance about |
| 19 | 16:06:30 | payment of preexisting and how it is handled. |
| 20 | 16:06:36 | Q.   Bear with me.  I'm checking through my |
| 21 | 16:06:40 | notes here. |
| 22 | 16:06:40 | A.   Okay. |
| 23 | 16:06:40 | Q.   Can you tell us whether or not |
| 24 | 16:06:42 | Starmark -- we discussed late enrollees, |
| 25 | 16:06:44 | right? |

| | | |
|---|---|---|
| 1 | 16:06:44 | A.    Yes. |
| 2 | 16:06:46 | Q.    Can you explain what is a late |
| 3 | 16:06:46 | enrollee? |
| 4 | 16:06:48 | A.    A late enrollee is someone who doesn't |
| 5 | 16:06:50 | apply for coverage within their waiting period |
| 6 | 16:06:54 | and their enrollment period of the extended 31 |
| 7 | 16:06:56 | days. |
| 8 | 16:06:56 | Q.    Well, who can be a late enrollee? |
| 9 | 16:07:00 | A.    Who can be a late enrollee? |
| 10 | 16:07:04 | Q.    Yes. |
| 11 | 16:07:04 | A.    I guess I don't understand the |
| 12 | 16:07:08 | question. |
| 13 | 16:07:14 | Q.    Well, what conditions apply before you |
| 14 | 16:07:18 | fall into this category?  Can anybody be a |
| 15 | 16:07:20 | late enrollee? |
| 16 | 16:07:20 | A.    You are a late enrollee if you are |
| 17 | 16:07:24 | hired by your employer, and you do not fill |
| 18 | 16:07:26 | out your applications and supply to Starmark |
| 19 | 16:07:38 | within your waiting period or your enrollment |
| 20 | 16:07:46 | period. |
| 21 | 16:07:46 | Q.    Okay.  And then what's the outer limit |
| 22 | 16:07:58 | of when you can be a late enrollee? |
| 23 | 16:08:02 | A.    I guess I don't understand what you |
| 24 | 16:08:04 | mean. |
| 25 | 16:08:04 | Q.    How late can you apply?  In other |

```
 1   16:08:06   words, can Ms. Virtue apply right now?

 2   16:08:08      A.   She is no longer an active employee.

 3   16:08:10      Q.   What about for periods of time when

 4   16:08:14   she was?

 5   16:08:14      A.   I don't understand what you mean.  She

 6   16:08:16   already did apply.

 7   16:08:18      Q.   Okay.  And as you sit here now, what's

 8   16:08:26   the reason she was denied coverage?

 9   16:08:28      A.   She wasn't denied coverage.

10   16:08:30      Q.   I beg your pardon?

11   16:08:32      A.   She wasn't denied coverage.

12   16:08:34      Q.   Okay.  I'm sorry.

13   16:08:36           Then what's the reason she was

14   16:08:38   not enrolled?

15   16:08:38      A.   The reason she wasn't enrolled was

16   16:08:40   twofold:  Number one, she never responded to

17   16:08:44   our inquiries.  We closed her out.

18   16:08:48           Number two, she checked the back

19   16:08:52   of her enrollment form saying that she was

20   16:08:54   waiving coverage for the employee for both

21   16:08:56   medical and dental.

22   16:09:00      Q.   Okay.

23   16:09:00      A.   But we never really got that far

24   16:09:02   because she never responded back to us.

25   16:09:08      Q.   Okay.  What's the first record that
```

| | | |
|---|---|---|
| 1 | 16:09:08 | you have that anybody at Starmark noticed that |
| 2 | 16:09:12 | she checked the waiver boxes? |
| 3 | 16:09:14 | A.   Oh, I don't know that. |
| 4 | 16:09:20 | Q.   And you would agree that, at least in |
| 5 | 16:09:22 | June of 2002, up to June 25th, the people in |
| 6 | 16:09:28 | Ms. Johnson's office are seeking more |
| 7 | 16:09:30 | information, right? |
| 8 | 16:09:32 | A.   They returned the information to her, |
| 9 | 16:09:36 | yes. |
| 10 | 16:09:36 | Q.   So it is not like they saw the waiver |
| 11 | 16:09:38 | boxes, and then just said, "That's the end of |
| 12 | 16:09:40 | the issue," right? |
| 13 | 16:09:42 | A.   Right. |
| 14 | 16:09:42 | Q.   So sitting here right now, you can't |
| 15 | 16:09:46 | tell us the first point in time where Starmark |
| 16 | 16:09:54 | saw the waiver boxes on the second page, |
| 17 | 16:09:56 | right? |
| 18 | 16:09:56 | A.   I can't tell you that.  I have no |
| 19 | 16:10:00 | documentation.  So I do not know. |
| 20 | 16:10:02 | Q.   And is it possible that that was just |
| 21 | 16:10:04 | noticed for the first time in preparation for |
| 22 | 16:10:06 | this process, this deposition? |
| 23 | 16:10:06 | A.   I doubt that. |
| 24 | 16:10:10 | Q.   Well, why do you say that? |
| 25 | 16:10:10 | A.   Because we are pretty thorough when we |

| | | |
|---|---|---|
| 1 | 16:10:14 | go through these applications.  So I would |
| 2 | 16:10:16 | doubt that this would be the first time |
| 3 | 16:10:18 | somebody would have noticed it. |
| 4 | 16:10:18 | Q.   But it is certainly true that nobody |
| 5 | 16:10:22 | noticed that at about the point where |
| 6 | 16:10:26 | Ms. Melendez sent her the status memorandum, |
| 7 | 16:10:32 | right? |
| 8 | 16:10:32 | A.   Yes. |
| 9 | 16:10:36 | Q.   If an application for enrollment is |
| 10 | 16:10:40 | mistakenly received late by Starmark, what |
| 11 | 16:10:48 | procedures does Starmark use to process |
| 12 | 16:10:52 | mistakenly late received applications? |
| 13 | 16:10:54 | A.   I don't understand what you mean by |
| 14 | 16:10:56 | "mistakenly late." |
| 15 | 16:10:58 | Q.   Assume clerical error. |
| 16 | 16:11:00 | A.   A clerical error? |
| 17 | 16:11:02 | Q.   You don't get it until a matter of |
| 18 | 16:11:04 | weeks have passed from the employee's original |
| 19 | 16:11:10 | eligibility date. |
| 20 | 16:11:12 | Is that a clear hypothetical? |
| 21 | 16:11:16 | A.   Repeat that again. |
| 22 | 16:11:18 | Q.   Assume that through clerical error the |
| 23 | 16:11:20 | application is received late, by a matter of |
| 24 | 16:11:24 | weeks.  Can you speak to what procedures |
| 25 | 16:11:26 | Starmark uses to process a late received |

58

| | | |
|---|---|---|
| 1 | 16:11:30 | application? |
| 2 | 16:11:30 | A.   If they are late by a matter of weeks, |
| 3 | 16:11:32 | and they are a new hire, they would be |
| 4 | 16:11:38 | processed as a late enrollee. |
| 5 | 16:11:42 | Q.   And are these procedures written down |
| 6 | 16:11:44 | anywhere? |
| 7 | 16:11:44 | A.   Yes. |
| 8 | 16:11:46 | Q.   Specifically? |
| 9 | 16:11:48 | A.   You should be able to find them in the |
| 10 | 16:11:52 | administration manual.  Do you have an |
| 11 | 16:11:54 | employer's administration guide? |
| 12 | 16:11:56 | Q.   You know, I think we do. |
| 13 | 16:12:00 | MR. FAYETTE:   I will ask for |
| 14 | 16:12:00 | Mr. Jacobson's help here:  There is a document |
| 15 | 16:12:02 | that we have designated Exhibit 5. |
| 16 | 16:12:08 | MR. JACOBSON:   It is entitled "Welcome |
| 17 | 16:12:10 | to Starmark." |
| 18 | 16:12:12 | MR. FAYETTE:   That's the first page I |
| 19 | 16:12:12 | have, and then at the very bottom there is a |
| 20 | 16:12:14 | Bates stamp 10938. |
| 21 | 16:12:18 | MR. JACOBSON:  All right.  That |
| 22 | 16:12:18 | exhibit is being tendered to the witness. |
| 23 | 16:12:24 | BY MR. FAYETTE: |
| 24 | 16:12:24 | Q.   Ms. Wendell, when you have had a |
| 25 | 16:12:26 | moment to check over that, can you tell us |

| | | |
|---|---|---|
| 1 | 16:12:28 | what that is? |
| 2 | 16:12:28 | A.   This is our administration guide that |
| 3 | 16:12:30 | we issue to each of our groups as they enroll |
| 4 | 16:12:34 | with us; not to the members, to the groups. |
| 5 | 16:12:36 | Q.   And it is a 50-something page |
| 6 | 16:12:40 | document, so you might want a minute to look |
| 7 | 16:12:42 | through it, but can you assure us that that's |
| 8 | 16:12:44 | the administration guide that employers would |
| 9 | 16:12:48 | have relied upon in 2002, at least that the |
| 10 | 16:12:52 | Bethel Group Home would have relied upon in |
| 11 | 16:12:54 | 2002? |
| 12 | 16:12:54 | A.   Yes, I believe so. |
| 13 | 16:12:56 | Q.   And now, to answer the question asked |
| 14 | 16:12:58 | a moment ago, I asked you a question about |
| 15 | 16:13:02 | late enrollees and if these policies are |
| 16 | 16:13:04 | written down anywhere.  Can you direct me to |
| 17 | 16:13:06 | where that would be in this document, in |
| 18 | 16:13:08 | Exhibit 5? |
| 19 | 16:13:10 | A.   Yes, I think so. |
| 20 | 16:13:26 | Page 7, under who is eligible, |
| 21 | 16:13:40 | when is someone eligible, and how to enroll |
| 22 | 16:13:42 | new employees and dependents. |
| 23 | 16:13:46 | Q.   Just bear with me, just for a second. |
| 24 | 16:13:50 | You agree that this is the |
| 25 | 16:13:56 | administration manual that Bethel Group Home |

```
1    16:13:58   would have relied upon in this particular case

2    16:14:02   in 2002, right?

3    16:14:02       A.   I believe so.

4    16:14:04       Q.   Could you turn to page 13?

5    16:14:12       A.   Okay.

6    16:14:14       Q.   I will direct your attention to the

7    16:14:16   very bottom of the page.  The Bates stamp

8    16:14:18   number, the five-digit number that we have put

9    16:14:20   on this, is page 10951.

10   16:14:24       A.   Yes.

11   16:14:24       Q.   This is a section that talks about

12   16:14:26   waiving coverage.

13   16:14:28       A.   Yes.

14   16:14:28       Q.   Would you agree these are the rules

15   16:14:30   that pertain to when an employee could waive

16   16:14:38   coverage under the group plan?

17   16:14:40       A.   Yes.

18   16:14:40       Q.   And what's the last sentence there?

19   16:14:42       A.   In the waiver section, two boxes must

20   16:14:44   be checked, coverage declined and the reason.

21   16:14:48       Q.   And then turn to that page of

22   16:14:52   Exhibit 10, if you would.

23   16:14:58       A.   Okay.

24   16:15:00       Q.   Is that why, on the second page of

25   16:15:02   Exhibit 10, in this waiver section, where the
```

| 1 | 16:15:04 | two boxes are checked, below that there is a |
|---|----------|----------------------------------------------|
| 2 | 16:15:08 | line that says:  "Reason for waiving |
| 3 | 16:15:10 | coverage," colon? |
| 4 | 16:15:12 | A.   Okay. |
| 5 | 16:15:14 | Q.   Is that why the form asks for that? |
| 6 | 16:15:16 | A.   Is that why the form asks for that? |
| 7 | 16:15:26 | I guess, yes. |
| 8 | 16:15:28 | Q.   And in Ms. Virtue's case, on the |
| 9 | 16:15:34 | second page of Exhibit 10, the reason is not |
| 10 | 16:15:36 | filled in?  Are we agreed about that? |
| 11 | 16:15:38 | A.   Yes. |
| 12 | 16:15:42 | Q.   You can set that aside. |
| 13 | 16:15:44 | Do you agree that before coverage |
| 14 | 16:15:58 | is waived, Starmark should get a reason? |
| 15 | 16:16:06 | A.   No. |
| 16 | 16:16:06 | Q.   Why not? |
| 17 | 16:16:08 | A.   Because it really doesn't make any |
| 18 | 16:16:14 | difference technically.  If they don't have a |
| 19 | 16:16:18 | good reason, we are not going to tell them |
| 20 | 16:16:20 | they have to take coverage. |
| 21 | 16:16:22 | Q.   Well, that's inconsistent with what it |
| 22 | 16:16:26 | says on page 13 of Exhibit 5, right? |
| 23 | 16:16:30 | A.   Yes. |
| 24 | 16:16:36 | Q.   A moment ago I asked you a series of |
| 25 | 16:16:40 | questions about clerical errors, processing |

| | | |
|---|---|---|
| 1 | 16:16:42 | errors, things coming in late, that sort of |
| 2 | 16:16:44 | thing. |
| 3 | 16:16:44 | A.  All right. |
| 4 | 16:16:46 | Q.  Can you tell us, from your personal |
| 5 | 16:16:48 | experience, what sort of errors in enrolling |
| 6 | 16:16:50 | new enrollees has Starmark experienced?  What |
| 7 | 16:16:56 | are some examples you can think of? |
| 8 | 16:16:58 | A.  Whose errors?  Our errors? |
| 9 | 16:17:00 | Q.  Or anyone.  I'm asking for examples. |
| 10 | 16:17:02 | I'm asking for, in your experience, errors |
| 11 | 16:17:06 | that have resulted in late receipt of an |
| 12 | 16:17:08 | application. |
| 13 | 16:17:08 | A.  I'm trying to think.  I mean, we do |
| 14 | 16:17:20 | have some, but I don't see a whole lot of |
| 15 | 16:17:22 | errors that happen. |
| 16 | 16:17:30 | Reasons that an application would |
| 17 | 16:17:32 | be late? |
| 18 | 16:17:34 | Q.  Or incomplete.  I'm looking for |
| 19 | 16:17:38 | examples of clerical or administrative errors. |
| 20 | 16:17:42 | A.  I guess there have been times when we |
| 21 | 16:17:48 | have gotten applications late because of |
| 22 | 16:17:50 | administration changes in an employer's |
| 23 | 16:17:56 | office. |
| 24 | 16:17:56 | Q.  That sort of thing has happened? |
| 25 | 16:17:58 | A.  You know, to be perfectly honest, do I |

63

| | | |
|---|---|---|
| 1 | 16:18:02 | actually remember an actual instance?  No. |
| 2 | 16:18:06 | Could I say that that possibly happened?  Yes, |
| 3 | 16:18:08 | but I can't give you an actual instance that |
| 4 | 16:18:10 | that was the case. |
| 5 | 16:18:12 | Q.   If you assume, in a case like that, |
| 6 | 16:18:16 | that the employer paid any back premiums due, |
| 7 | 16:18:20 | would Starmark deny coverage to an otherwise |
| 8 | 16:18:24 | eligible employee in that case? |
| 9 | 16:18:26 | A.   Would we deny coverage?  I guess each |
| 10 | 16:18:32 | situation would be different depending on how |
| 11 | 16:18:34 | late you are talking.  I mean, an application |
| 12 | 16:18:38 | can't be any more than 60 days stale dated |
| 13 | 16:18:40 | old.  So it depends on your definition of |
| 14 | 16:18:42 | "late" and when somebody would come back and |
| 15 | 16:18:46 | ask us to do that. |
| 16 | 16:18:46 | Q.   You just mentioned that an application |
| 17 | 16:18:50 | can't be more than 60 days stale dated old. |
| 18 | 16:18:52 | A.   Right. |
| 19 | 16:18:52 | Q.   Can you tell me where it says that? |
| 20 | 16:18:54 | A.   Let me look in the admin guide.  I |
| 21 | 16:19:02 | believe it says it in the administration |
| 22 | 16:19:04 | guide. |
| 23 | 16:19:04 | It actually says on the |
| 24 | 16:19:06 | application itself, under agreement and |
| 25 | 16:19:08 | authorization: "I also understand that all |

```
 1    16:19:12    statements and answers made in this

 2    16:19:12    application will be valid for 60 days from the

 3    16:19:16    date signed." So anything after 60 days we

 4    16:19:20    ask them for a new application.

 5    16:19:24       Q.   So that implies that you would accept

 6    16:19:28    a new application after 60 days, right?  They

 7    16:19:32    would just send a new form in?

 8    16:19:34       A.   Depending on the situation.

 9    16:19:36       Q.   So you are saying it is possible that

10    16:19:38    if an employer paid back premiums, you would

11    16:19:42    process an application received more than 60

12    16:19:44    days later, right?

13    16:19:46       A.   It is really hard to say.  I mean, it

14    16:19:50    depends on the situation and what occurred.

15    16:19:52       Q.   Well, let's look at Exhibit 5, that's

16    16:19:58    the employer's administration manual.

17    16:20:02       A.   Yes.

18    16:20:02       Q.   If you could turn to page 12.

19    16:20:10       A.   Okay.

20    16:20:10       Q.   And I'm looking at Miscellaneous

21    16:20:12    Administration section.  There is Section 1

22    16:20:16    and then there is Section 2.

23    16:20:16       A.   Yes.

24    16:20:18       Q.   Could you read to me paragraph 2

25    16:20:20    there, clerical errors?
```

| | | |
|---|---|---|
| 1 | 16:20:22 | A.    "Clerical errors by the employer or by |
| 2 | 16:20:24 | us shall not invalidate coverage of a person |
| 3 | 16:20:30 | insured.  This includes errors in enrolling, |
| 4 | 16:20:32 | recording or reporting for coverage purposes. |
| 5 | 16:20:34 | Any premium not paid because of the error must |
| 6 | 16:20:36 | be paid in full at the time the error is |
| 7 | 16:20:38 | corrected." |
| 8 | 16:20:38 | Q.    Would that kind of clerical error |
| 9 | 16:20:42 | include not having a group number on the |
| 10 | 16:20:44 | application? |
| 11 | 16:20:44 | A.    I don't consider that a clerical |
| 12 | 16:20:46 | error. |
| 13 | 16:20:48 | Q.    Well, what do you consider that? |
| 14 | 16:20:50 | A.    No one made an error.  They didn't |
| 15 | 16:20:54 | supply it.  I don't consider it an error |
| 16 | 16:20:56 | because response wasn't made.  It wasn't |
| 17 | 16:20:58 | because the group number wasn't there.  The |
| 18 | 16:21:00 | reason coverage wasn't afforded is because |
| 19 | 16:21:02 | response wasn't made to inquiries by mail.  So |
| 20 | 16:21:04 | I don't think there was any error made |
| 21 | 16:21:06 | clerically on this one.  I think we did |
| 22 | 16:21:08 | everything we were supposed to do. |
| 23 | 16:21:10 | Q.    I'm going to ask you this:  Can you |
| 24 | 16:21:12 | tell us when coverage ends under this |
| 25 | 16:21:14 | certificate of insurance? |

```
1   16:21:16    A.    When coverage ends?

2   16:21:18    Q.    Yes.

3   16:21:18    A.    The end of the month of employment.

4   16:21:24    Q.    So, in other words, assume that

5   16:21:28    somebody quits on the 15th of any given month.

6   16:21:30    When does coverage under the Starmark group

7   16:21:36    health policy --

8   16:21:36    A.    The end of that month.

9   16:21:36    Q.    So the 30th or the 31st, whatever the

10  16:21:38    last day is?

11  16:21:38    A.    Whatever the last day of that month

12  16:21:40    is, coverage ends.

13  16:21:48    Q.    I'm going to return to a concept I

14  16:21:50    just addressed a moment ago, and tell me if

15  16:21:52    you have completed your answer to it:  If,

16  16:21:56    because of an erroneous failure to submit her

17  16:21:58    application, Ms. Virtue submitted an

18  16:22:00    application today, would she have coverage for

19  16:22:02    the time period she was otherwise eligible for

20  16:22:04    enrollment, otherwise employed by Bethel Group

21  16:22:08    Home?

22  16:22:08    A.    No.

23  16:22:10    Q.    After completion of her waiting

24  16:22:12    period?

25  16:22:12    A.    No.
```

67

```
1    16:22:12    Q.   Okay.  Why not?

2    16:22:14    A.   Why would we not accept an application

3    16:22:16    today?

4    16:22:16    Q.   Well, I guess let me get clear on my

5    16:22:20    question.  I know it is a long question.  Here

6    16:22:22    is my question.

7    16:22:24             If, because of erroneous failure

8    16:22:26    to submit her application, Ms. Virtue

9    16:22:28    submitted her application today, would she

10   16:22:32    have coverage for the time period she was

11   16:22:36    otherwise eligible, meaning the time period

12   16:22:38    she was employed by Bethel Group Home after

13   16:22:40    completion of her waiting period?

14   16:22:42    A.   No.

15   16:22:42    Q.   Okay.  And why not?

16   16:22:44    A.   Because she did not respond to our

17   16:22:50    inquiries by mail within the ten days that we

18   16:22:52    gave her to get back to us concerning the fact

19   16:22:56    that we didn't have a group number.  She

20   16:22:58    didn't respond.  I mean, we sent letters

21   16:23:04    twice, to get her to respond to us, and she

22   16:23:06    did not.  So we would not afford coverage.

23   16:23:08    Q.   Give me a moment, please.

24   16:23:18             Well, sure, but what if she was

25   16:23:20    hospitalized during that period?
```

68

```
 1   16:23:22    A.   I'm sorry.  I don't believe we would

 2   16:23:28    afford coverage.

 3   16:23:30    Q.   But you agree that other than the two

 4   16:23:34    attempts to contact her by mail, that we have

 5   16:23:36    already talked about this afternoon, you have

 6   16:23:38    no records of any other attempt to contact

 7   16:23:42    Ms. Virtue to obtain that missing group

 8   16:23:46    number; agreed?

 9   16:23:46    A.   Agreed.

10   16:23:50         MR. FAYETTE:  Bear with me again.

11   16:24:00             (Brief pause.)

12   16:24:00    BY MR. FAYETTE:

13   16:24:00    Q.   Can you explain why you wouldn't have

14   16:24:02    given her coverage if she had been

15   16:24:06    hospitalized, but made a good faith effort to

16   16:24:08    enroll by sending you the application, along

17   16:24:10    with the employer's memo saying:  "Please

18   16:24:12    enroll her"?

19   16:24:14    A.   It is just not procedure.  We just

20   16:24:18    would not do that.

21   16:24:22    Q.   Any other explanation than that?

22   16:24:24    A.   No.

23   16:24:26    Q.   And I understood your answer to be no?

24   16:24:26    A.   No.

25   16:24:28         MR. FAYETTE:  All right.  Let me check
```

69

| | | |
|---|---|---|
| 1 | 16:24:30 | my notes. |
| 2 | 16:24:34 | What I would like to do is go off |
| 3 | 16:24:38 | record at this point for a couple of minutes, |
| 4 | 16:24:42 | as we did last time. I'm closer to the end |
| 5 | 16:24:44 | than the beginning. So I would ask you to |
| 6 | 16:24:46 | bear with me. |
| 7 | 16:24:46 | I will leave the phone line open, |
| 8 | 16:24:50 | but I would ask the court reporter to go off |
| 9 | 16:24:52 | record for a period of about two minutes. |
| 10 | 16:24:54 | (Recess taken.) |
| 11 | 16:40:04 | MR. FAYETTE:  Back on record. |
| 12 | 16:40:06 | Counsel, I'm going to voice an |
| 13 | 16:40:08 | objection that I voiced as we convened, but |
| 14 | 16:40:10 | not on the record. I will place on record now |
| 15 | 16:40:14 | my continuing objection to Ms. Magura's |
| 16 | 16:40:18 | participation. She's not a party. I don't |
| 17 | 16:40:20 | believe she has got a right to participate. I |
| 18 | 16:40:22 | would ask that you agree that I told you that, |
| 19 | 16:40:24 | before we started this deposition, and that I |
| 20 | 16:40:26 | indicated that in a desire not to derail this |
| 21 | 16:40:30 | deposition, and waste so many folks' time, I |
| 22 | 16:40:34 | decided not to try to get a judge on the line |
| 23 | 16:40:36 | to resolve the objection. |
| 24 | 16:40:38 | So if I have misstated the |
| 25 | 16:40:40 | history of that, feel free to correct me now. |