| | | |
|---|---|---|
| 1 | 16:40:42 | MR. VALCARCE:  If you want a response, |
| 2 | 16:40:44 | my response is I think it has been waived |
| 3 | 16:40:46 | because it was not made on the record, and my |
| 4 | 16:40:48 | second point would be that this deposition was |
| 5 | 16:40:50 | noticed about four days ago.  So to expedite |
| 6 | 16:40:54 | and accommodate your late scheduling of a |
| 7 | 16:40:56 | deposition, where we would have to get the |
| 8 | 16:40:58 | transcript, anyway, to my expert, she is just |
| 9 | 16:41:02 | listening on the phone. |
| 10 | 16:41:04 | Go ahead, though. |
| 11 | 16:41:04 | MR. FAYETTE:  I'm going to proceed |
| 12 | 16:41:06 | with questions. |
| 13 | 16:41:06 | BY MR. FAYETTE: |
| 14 | 16:41:08 | Q.  Ms. Wendell, I would ask you to take |
| 15 | 16:41:10 | up the certificate of insurance that is |
| 16 | 16:41:14 | Exhibit 9, I believe. |
| 17 | 16:41:14 | A.  Yes. |
| 18 | 16:41:20 | Q.  You stated earlier that the definition |
| 19 | 16:41:22 | of "preexisting conditions" is on page 39 of |
| 20 | 16:41:26 | that document? |
| 21 | 16:41:26 | A.  I believe so.  Let me check again.  I |
| 22 | 16:41:30 | believe that was the page I was looking at. |
| 23 | 16:41:32 | Yes. |
| 24 | 16:41:32 | Q.  And this part that I'm looking at on |
| 25 | 16:41:40 | page 39 is three paragraphs down, under the |

| | | |
|---|---|---|
| 1 | 16:41:42 | comprehensive medical benefits section? |
| 2 | 16:41:46 | A.   Yes. |
| 3 | 16:41:46 | Q.   Can we agree that's the definition of |
| 4 | 16:41:50 | preexisting conditions that would have applied |
| 5 | 16:41:52 | had Ms. Virtue been enrolled in May of 2002? |
| 6 | 16:41:56 | A.   Yes. |
| 7 | 16:41:58 | Q.   Can you then go and read that |
| 8 | 16:42:00 | definition into that record, please? |
| 9 | 16:42:02 | A.   "Preexisting condition is sickness or |
| 10 | 16:42:04 | injury for which a person has during the six |
| 11 | 16:42:06 | months just prior to his or her enrollment |
| 12 | 16:42:08 | date under this plan:  One, received medical |
| 13 | 16:42:10 | care, advice or treatment; two, had drugs or |
| 14 | 16:42:14 | medicines prescribed, whether taken or not, or |
| 15 | 16:42:16 | had diagnostic tests ordered, whether |
| 16 | 16:42:18 | performed or not.  Such condition will be |
| 17 | 16:42:20 | deemed to be preexisting, whether or not the |
| 18 | 16:42:20 | final diagnosis has been made.  Pregnancy is |
| 19 | 16:42:22 | not a preexisting condition.  Genetic |
| 20 | 16:42:26 | information shall not be treated as |
| 21 | 16:42:28 | preexisting condition in the absence of a |
| 22 | 16:42:30 | diagnosis if the condition related to such |
| 23 | 16:42:32 | information." |
| 24 | 16:42:32 | Q.   Ms. Wendell, are you qualified to |
| 25 | 16:42:36 | speak as to what medical conditions or what |

```
 1    16:42:38    would or would not fall within that

 2    16:42:40    definition?

 3    16:42:40      A.   No, I cannot.

 4    16:42:42      Q.   Who would be?

 5    16:42:44      A.   You would need to speak with our

 6    16:42:46    benefits area, Penny Gregory.

 7    16:42:58         MR. MC DANIEL:   Jay, were we a party

 8    16:43:00    to this, I think we would object on the

 9    16:43:02    grounds that we don't have complete

10    16:43:04    information.  We wouldn't be able to respond

11    16:43:06    to this because we don't have any information

12    16:43:10    that we would need.

13    16:43:10         MR. FAYETTE:  Very well.

14    16:43:10    BY MR. FAYETTE:

15    16:43:12      Q.   I would like to return to our

16    16:43:14    discussion about the waiver section,

17    16:43:14    Ms. Wendell.

18    16:43:16      A.   Yes.

19    16:43:16      Q.   On Exhibit 10, we discussed earlier on

20    16:43:20    Exhibit 10 the waiver boxes appear to be

21    16:43:22    checked in Ms. Virtue's case?

22    16:43:24      A.   Yes.

23    16:43:24      Q.   Can you give us an idea of how often

24    16:43:28    Starmark gets forms where the waiver boxes are

25    16:43:34    checked and how frequent is that?
```

```
1    16:43:36    A.   Oh, it is a regular occurrence.  I

2    16:43:38    can't give you a number, but it is daily.

3    16:43:40    Q.   And can you give us some sort of idea

4    16:43:44    in how many of those cases the entire

5    16:43:46    application is completed, but then the waiver

6    16:43:50    boxes on the last page are checked as well?

7    16:43:54    A.   Oh, I don't know.  I have never really

8    16:43:56    looked at it that way.  I don't know.

9    16:43:58    Q.   Are you ever aware of that happening

10   16:44:00    previously?

11   16:44:02    A.   Of where it is all filled out, and

12   16:44:04    they have check marked the waiver?

13   16:44:06    Q.   Yes.

14   16:44:08    A.   Oh, yes.

15   16:44:08    Q.   Does that strike you as an apparent

16   16:44:12    inconsistency?

17   16:44:12    A.   To fill it out and do the waiver form?

18   16:44:14    No.

19   16:44:16    Q.   Why not?

20   16:44:16    A.   Because most people, when they are

21   16:44:20    given a form, fill out the whole form, even if

22   16:44:22    they are waiving it or not.

23   16:44:22    Q.   Do you agree that there are some

24   16:44:24    elements that are inconsistent; for instance,

25   16:44:28    where the person writes down who the
```

74

| | | |
|---|---|---|
| 1 | 16:44:28 | beneficiary is, and gives a medical history |
| 2 | 16:44:32 | down to whether or not they are a smoker or |
| 3 | 16:44:34 | not, but then waives coverage? |
| 4 | 16:44:38 | A.   It is really not unusual. |
| 5 | 16:44:40 | Q.   Do you agree that it is an apparent |
| 6 | 16:44:42 | inconsistency? |
| 7 | 16:44:44 | A.   I guess, no, I don't agree. |
| 8 | 16:44:46 | Q.   Then let's go outside the application, |
| 9 | 16:44:48 | to the memorandum in this case, which Starmark |
| 10 | 16:44:50 | received the one that bears Mr. Alexander's |
| 11 | 16:44:54 | signature. |
| 12 | 16:44:54 | A.   Yes. |
| 13 | 16:44:56 | Q.   We are agreed that that letter is not |
| 14 | 16:44:58 | ambiguous, right? |
| 15 | 16:44:58 | A.   It is not what? |
| 16 | 16:45:00 | Q.   It is not ambiguous.   It is clear. |
| 17 | 16:45:02 | A.   Yes. |
| 18 | 16:45:02 | Q.   And do you consider it to be |
| 19 | 16:45:06 | inconsistent with the waiver boxes being |
| 20 | 16:45:10 | checked? |
| 21 | 16:45:10 | A.   No. |
| 22 | 16:45:12 | Q.   Okay.   Explain why not. |
| 23 | 16:45:14 | A.   Because there are times, just because |
| 24 | 16:45:16 | an employer gives us a memorandum, it doesn't |
| 25 | 16:45:20 | mean that he has reviewed the application, and |

| | | |
|---|---|---|
| 1 | 16:45:22 | he may not realize what the employee has done. |
| 2 | 16:45:26 | So it is not unusual for us to get something, |
| 3 | 16:45:28 | such as this, asking us to enroll.  I mean, it |
| 4 | 16:45:32 | is just a formality, a cover letter.  It is |
| 5 | 16:45:36 | not unusual for us to get that, not knowing |
| 6 | 16:45:38 | what the employee has done.  It is not unusual |
| 7 | 16:45:40 | at all. |
| 8 | 16:45:40 | Q.    But in this case, it is a little bit |
| 9 | 16:45:42 | more than a cover letter; wouldn't you agree? |
| 10 | 16:45:44 | And the way I will phrase the question is:  Do |
| 11 | 16:45:46 | you agree that Mr. Alexander's letter |
| 12 | 16:45:50 | references Ms. Virtue by name? |
| 13 | 16:45:52 | A.    Oh, yes. |
| 14 | 16:45:54 | Q.    So had Starmark detected an |
| 15 | 16:45:58 | inconsistency, what follow-up steps do you |
| 16 | 16:46:00 | think Starmark would have done? |
| 17 | 16:46:02 | A.    I don't think we would have thought |
| 18 | 16:46:08 | this inconsistent. |
| 19 | 16:46:10 | Q.    Do you consider Ms. Virtue to have |
| 20 | 16:46:12 | been a timely applicant? |
| 21 | 16:46:14 | A.    Yes. |
| 22 | 16:46:16 | Q.    And explain why, please. |
| 23 | 16:46:18 | A.    As I have said earlier, her |
| 24 | 16:46:22 | application was signed and dated within her |
| 25 | 16:46:24 | 90-day waiting period and the 31-day extension |

| | | |
|---|---|---|
| 1 | 16:46:30 | of enrollment period.  So she would have been |
| 2 | 16:46:32 | considered timely. |
| 3 | 16:46:34 | Q.  And assuming that she did not waive |
| 4 | 16:46:36 | coverage, do you agree that she would have had |
| 5 | 16:46:40 | coverage under this plan from May 1st, 2002 to |
| 6 | 16:46:44 | May 31st of 2002? |
| 7 | 16:46:46 | A.  If she hadn't waived coverage. |
| 8 | 16:46:50 | Q.  So assuming that, the answer to my |
| 9 | 16:46:54 | question is yes? |
| 10 | 16:46:54 | A.  Assuming that she didn't waive |
| 11 | 16:46:56 | coverage, yes. |
| 12 | 16:46:58 | Q.  And then assuming that she was no |
| 13 | 16:47:00 | longer an employee sometime in mid-May of |
| 14 | 16:47:06 | 2002, you agree that her coverage would have |
| 15 | 16:47:08 | ended on May 31st, 2002? |
| 16 | 16:47:10 | A.  If that's when she would have |
| 17 | 16:47:10 | terminated employment, yes. |
| 18 | 16:47:12 | MR. FAYETTE:  Let me check my notes. |
| 19 | 16:47:14 | THE WITNESS:  I thought it was June. |
| 20 | 16:47:18 | BY MR. FAYETTE: |
| 21 | 16:47:18 | Q.  Okay.  We are assuming she terminated |
| 22 | 16:47:20 | in mid-May 2002. |
| 23 | 16:47:22 | A.  Okay.  Then it would be May 31st. |
| 24 | 16:47:26 | MR. FAYETTE:  I will ask you to bear |
| 25 | 16:47:26 | with me for a moment. |

```
1    16:47:26                    (Brief pause.)

2    16:47:52    BY MR. FAYETTE:

3    16:47:52         Q.    Ms. Wendell, can you tell us how

4    16:47:54    premiums would have been calculated under this

5    16:47:56    policy?

6    16:47:56         A.    What do you mean how premiums would

7    16:48:00    have been calculated?

8    16:48:00         Q.    Does the number of employees enrolled

9    16:48:02    in the plan have any bearing on what premium

10   16:48:06    is charged by Starmark?

11   16:48:08         A.    We do a list bill.  It is not

12   16:48:16    composite rated where it is the number of

13   16:48:18    employees.  It is based on each employee is

14   16:48:20    billed based on their age, and male/female,

15   16:48:28    et cetera.  I don't know Alaska law, whether

16   16:48:32    or not it allows them to do male/female, but

17   16:48:38    it is a list bill that is issued to the group.

18   16:48:40    It states each employee, and it tells you what

19   16:48:40    their premium is, but it is not based, as far

20   16:48:44    as I know, on the number of lives.

21   16:48:48         Q.    I'm sorry.  I have got to return to

22   16:48:54    your last answer because I'm not sure I

23   16:48:56    understand it:  So are you saying that the

24   16:48:58    number of employees doesn't affect what the

25   16:49:00    employer is billed?
```

| | | |
|---|---|---|
| 1 | 16:49:02 | A.  I don't believe it is number of |
| 2 | 16:49:02 | employees.  As far as I know, we don't base it |
| 3 | 16:49:06 | on the number of employees when it is a small |
| 4 | 16:49:08 | group like this.  It is based on age and other |
| 5 | 16:49:14 | factors, but I don't believe it is group size. |
| 6 | 16:49:18 | I don't know that absolutely, positively, but, |
| 7 | 16:49:22 | as far as I can recollect, on rating, I don't |
| 8 | 16:49:24 | believe number of employees has any bearing on |
| 9 | 16:49:28 | the rates. |
| 10 | 16:49:28 | Q.  What about claims submitted, if the |
| 11 | 16:49:32 | employer has one employee submitting a high |
| 12 | 16:49:34 | number of claims?  What effect does that have? |
| 13 | 16:49:36 | A.  You are out of my league.  I don't do |
| 14 | 16:49:40 | that part of the administration, the renewal |
| 15 | 16:49:42 | and the underwriting.  So I don't know. |
| 16 | 16:49:44 | Q.  Okay.  You know my next question:  Do |
| 17 | 16:49:50 | you know who would be able to speak to those |
| 18 | 16:49:54 | subjects? |
| 19 | 16:49:54 | A.  I would think you would want to talk |
| 20 | 16:49:56 | to either our actuarial area or our renewal |
| 21 | 16:50:00 | area.  I would imagine you would want to talk |
| 22 | 16:50:02 | to Tami Lykins. |
| 23 | 16:50:02 | Q.  And could I impose upon you to spell |
| 24 | 16:50:02 | her name for me? |
| 25 | 16:50:04 | A.  T-a-m-i is the first name.  Lykins, |

79

```
 1   16:50:06   L-y-k-i-n-s.

 2   16:50:10      Q.   And what's her title?  Is she an

 3   16:50:12   assistant vice president, in charge of --

 4   16:50:14      A.   Underwriting and renewals.

 5   16:50:16         MR. FAYETTE:   Underwriting and

 6   16:50:18   renewals.  Okay.

 7   16:50:18            Again, bear with me for a moment.

 8   16:50:22   I think I'm closer to the end than the

 9   16:50:24   beginning.

10   16:50:26            Ms. Wendell, I'm going to thank

11   16:50:26   you for your patience with me this afternoon.

12   16:50:30   I think I have concluded my questions, unless

13   16:50:32   I have redirect after Mr. Valcarce's.

14   16:50:34         THE WITNESS:   Okay.

15   16:50:34            E X A M I N A T I O N

16   16:50:36   BY MR. VALCARCE:

17   16:50:36      Q.   Hello, Ms. Wendell.  Good afternoon.

18   16:50:40   This is Jim Valcarce.

19   16:50:40            Can you hear me okay?

20   16:50:42      A.   Yes, I can.

21   16:50:42      Q.   I'm going to repeat just a little bit

22   16:50:44   of your testimony earlier, simply to lay a

23   16:50:46   foundation.

24   16:50:48            You are the second vice president

25   16:50:48   there at Starmark Insurance; is that correct?
```

80

| | | |
|---|---|---|
| 1 | 16:50:52 | A.   Yes, administration. |
| 2 | 16:50:52 | Q.   And as vice president, you are |
| 3 | 16:50:54 | certainly aware of the insurance enrollment |
| 4 | 16:50:58 | procedures at Starmark; is that accurate? |
| 5 | 16:51:00 | A.   Yes. |
| 6 | 16:51:02 | Q.   And prior to today, you reviewed |
| 7 | 16:51:06 | at least most of the documents there in your |
| 8 | 16:51:08 | company's possession that involve my client, |
| 9 | 16:51:10 | Melissa Virtue; is that correct? |
| 10 | 16:51:12 | A.   Yes. |
| 11 | 16:51:12 | Q.   And based upon your review of the |
| 12 | 16:51:16 | documents, you came here today to answer |
| 13 | 16:51:18 | questions in regards to enrollment and |
| 14 | 16:51:22 | administration of a policy involving her; is |
| 15 | 16:51:26 | that accurate? |
| 16 | 16:51:26 | A.   Yes. |
| 17 | 16:51:28 | Q.   And based upon your review of the |
| 18 | 16:51:30 | documents, did Ms. Virtue obtain health |
| 19 | 16:51:34 | insurance from Starmark? |
| 20 | 16:51:36 | A.   No. |
| 21 | 16:51:36 | Q.   And we talked about you mentioned two |
| 22 | 16:51:40 | of the reasons for that, and I want to talk |
| 23 | 16:51:42 | about one of the reasons.  Do you have what's |
| 24 | 16:51:46 | been marked as Exhibit 10 in front of you? |
| 25 | 16:51:48 | A.   Yes. |

1    16:51:50    Q.   On my Exhibit 10, on page 2, there is

2    16:51:54    a waiver of coverage section.  Do you see

3    16:51:56    that?

4    16:51:56    A.   Yes.

5    16:51:58    Q.   Now, in regards to the document, that

6    16:52:00    enrollment form marked as Exhibit 10, that you

7    16:52:04    received or your office received on May 13th,

8    16:52:06    2002, is the waiver of coverage section

9    16:52:10    checked?

10   16:52:10    A.   The waiver of coverage section

11   16:52:14    checked?

12   16:52:14    Q.   Yes.   There are some boxes that are

13   16:52:18    checked; how about that?

14   16:52:18    A.   There is boxes checked in that

15   16:52:20    section, yes.

16   16:52:20    Q.   And what does that mean when those

17   16:52:24    boxes are checked?

18   16:52:24    A.   It means that the employee has waived

19   16:52:26    their right to have those coverages for

20   16:52:30    themselves.

21   16:52:30    Q.   "Coverages" meaning insurance?

22   16:52:32    A.   Insurance coverage, either medical or

23   16:52:34    dental insurance coverage.

24   16:52:36    Q.   And you don't have any information as

25   16:52:38    to who checked those boxes; do you?

```
 1   16:52:40    A.   No, sir.

 2   16:52:42    Q.   Now, there was a point being made

 3   16:52:44    earlier that the application was returned to

 4   16:52:48    Ms. Virtue because there was no group number,

 5   16:52:50    and I want to discuss really the real effect

 6   16:52:56    of that failure to return this application.

 7   16:52:56              Now, assume in my scenario that

 8   16:53:00    the application had been returned with the

 9   16:53:02    group number right away.  What would the

10   16:53:04    effect have been?

11   16:53:06    A.   Well, we would have waived the

12   16:53:08    coverage.  We would have sent her a letter

13   16:53:12    telling her that her coverage has been waived.

14   16:53:14    Q.   Okay.  So as far as the point being

15   16:53:18    made that maybe other things should have been

16   16:53:22    done to get the group number, in your opinion

17   16:53:24    would it have made a difference?

18   16:53:26    A.   No.

19   16:53:26    Q.   And why?

20   16:53:28    A.   Because she waived coverage.

21   16:53:32    Q.   But there was also a point made that:

22   16:53:34    "Well, what about if Ms. Virtue submitted an

23   16:53:36    application today; would she be able to get

24   16:53:38    insurance?"  What's your answer to that?

25   16:53:40    A.   If she submitted it today?
```

```
 1   16:53:42    Q.    Yes.

 2   16:53:44    A.    No.

 3   16:53:44    Q.    And why?

 4   16:53:46          I'm sorry, I don't mean to cut

 5   16:53:48    you off, but the question is why?

 6   16:53:48    A.    Well, there are several reasons.

 7   16:53:50    Number one, it is way beyond when the group

 8   16:53:56    has been active with us or she has been an

 9   16:53:58    active employee.

10   16:54:02    Q.    Okay.  And how about the waiver of

11   16:54:04    coverage section; is that also a point of why

12   16:54:06    she wouldn't get coverage today?

13   16:54:08    A.    She wouldn't get coverage today based

14   16:54:14    on this application, no.

15   16:54:20    Q.    So as far as this information or these

16   16:54:22    questions in regards to what Starmark could

17   16:54:24    have done to get the group number, besides

18   16:54:28    sending the application back, if the

19   16:54:32    application had the group number on it, would

20   16:54:36    Ms. Virtue have had health insurance?

21   16:54:38    A.    No.

22   16:54:40    Q.    And, once again, why?

23   16:54:42    A.    Because in the waiver of coverage

24   16:54:46    section of her application, she checked that

25   16:54:48    she waived medical and dental coverage, or I
```

84

| | | |
|---|---|---|
| 1 | 16:54:52 | shouldn't say -- |
| 2 | 16:54:54 | Q.   She checked? |
| 3 | 16:54:56 | We don't know she checked them? |
| 4 | 16:54:58 | A.   I don't know that she checked them. |
| 5 | 16:55:02 | The boxes were checked. |
| 6 | 16:55:02 | Q.   And, I'm sorry, I cut you off there, |
| 7 | 16:55:02 | and I was talking over you.  I want to make |
| 8 | 16:55:04 | sure I got your answer.  Go ahead. |
| 9 | 16:55:06 | A.   The answer is that we received an |
| 10 | 16:55:08 | application where the waiver of coverage |
| 11 | 16:55:12 | section had boxes checked for waiving medical |
| 12 | 16:55:12 | and dental coverage. |
| 13 | 16:55:14 | MR. VALCARCE:  I think I am just about |
| 14 | 16:55:16 | done, but if I could have two seconds, I need |
| 15 | 16:55:20 | to talk to my expert, and I will be right |
| 16 | 16:55:22 | back.  So if you could pause for just a |
| 17 | 16:55:24 | second.  Thank you. |
| 18 | 16:55:32 | (Recess taken.) |
| 19 | 17:02:46 | MR. VALCARCE:  Back on the record. |
| 20 | 17:02:52 | BY MR. VALCARCE: |
| 21 | 17:02:52 | Q.   Ms. Wendell, one last question:  If |
| 22 | 17:02:58 | Bethel Group Home wanted to ensure one of its |
| 23 | 17:03:00 | employees was enrolled, what forms or |
| 24 | 17:03:02 | documents would it get from Starmark so it |
| 25 | 17:03:04 | could ensure its employees were accurately |

| | | |
|---|---|---|
| 1 | 17:03:08 | enrolled? |
| 2 | 17:03:08 | A.    Each group gets a -- |
| 3 | 17:03:10 | MR. FAYETTE:  Object to form. |
| 4 | 17:03:12 | Go ahead. |
| 5 | 17:03:14 | THE WITNESS:  Each group gets a bill, |
| 6 | 17:03:18 | monthly, that lists every employee that's |
| 7 | 17:03:22 | covered.  So as verification of who is being |
| 8 | 17:03:24 | covered and who they are paying premiums for, |
| 9 | 17:03:26 | it would be on their monthly billing. |
| 10 | 17:03:30 | BY MR. VALCARCE: |
| 11 | 17:03:30 | Q.    That monthly bill actually lists the |
| 12 | 17:03:34 | names of these employees who were covered? |
| 13 | 17:03:36 | A.    Yes.  It lists member ID number, |
| 14 | 17:03:40 | member insured, and then it lists what premium |
| 15 | 17:03:44 | is being billed for each one of those members. |
| 16 | 17:03:46 | Q.    And in the review of your documents, |
| 17 | 17:03:50 | did you see any documents from Bethel Group |
| 18 | 17:03:52 | Home at any point, involving Melissa Virtue, |
| 19 | 17:03:56 | where Bethel Group Home said:  "Well, wait a |
| 20 | 17:03:58 | second.  She needs to be enrolled, and she |
| 21 | 17:04:00 | wasn't, and there was a mistake"?  Did you |
| 22 | 17:04:04 | ever get anything like that? |
| 23 | 17:04:06 | A.    No.  There is nothing in the file. |
| 24 | 17:04:08 | MR. VALCARCE:  Okay. |
| 25 | 17:04:08 | MR. FAYETTE:  This is James Fayette. |

| | | |
|---|---|---|
| 1 | 17:04:12 | May I pose some questions on redirect? |
| 2 | 17:04:14 | Jim, are you done? |
| 3 | 17:04:16 | MR. VALCARCE:  Yes, I'm done.  Thanks. |
| 4 | 17:04:18 | MR. FAYETTE:  I will try to be brief, |
| 5 | 17:04:20 | Ms. Wendell. |
| 6 | 17:04:20 | F U R T H E R   E X A M I N A T I O N |
| 7 | 17:04:20 | BY MR. FAYETTE: |
| 8 | 17:04:20 | Q.   You have talked about late enrollees |
| 9 | 17:04:32 | and late submitted applications.  What would |
| 10 | 17:04:38 | happen if you had received a new, complete |
| 11 | 17:04:42 | application from Ms. Virtue in November of |
| 12 | 17:04:44 | 2002? |
| 13 | 17:04:46 | A.   We wouldn't have processed that |
| 14 | 17:04:48 | application because we had information that |
| 15 | 17:04:50 | she is no longer employed. |
| 16 | 17:04:54 | Q.   Even for periods when she was |
| 17 | 17:04:56 | otherwise eligible? |
| 18 | 17:04:56 | A.   If the new application was signed |
| 19 | 17:05:00 | after that termination date, we would not have |
| 20 | 17:05:02 | accepted it. |
| 21 | 17:05:06 | Q.   And you have no record of any |
| 22 | 17:05:08 | correspondence on Ms. Virtue's behalf |
| 23 | 17:05:12 | submitted in November of 2002; is that |
| 24 | 17:05:14 | correct? |
| 25 | 17:05:14 | A.   I do not have anything in my files. |

87

```
 1   17:05:16     Q.   We are agreed that the contract for

 2   17:05:18  insurance is between Ms. Virtue and Starmark;

 3   17:05:22  is that correct?

 4   17:05:22          MR. VALCARCE:  Objection to scope.

 5   17:05:26          Go ahead.  I needed to make an

 6   17:05:28  objection there.  So excuse that.

 7   17:05:30          MR. FAYETTE:  Do you need the question

 8   17:05:32  again?

 9   17:05:32          THE WITNESS:  Yes.

10   17:05:34  BY MR. FAYETTE:

11   17:05:34     Q.   You would agree that the contract of

12   17:05:36  insurance is between Ms. Virtue and Starmark?

13   17:05:38     A.   I don't agree.

14   17:05:38     Q.   Why not?

15   17:05:40     A.   This is group insurance.  Our contract

16   17:05:42  is between us and the group.  They make

17   17:05:44  application for the insurance.

18   17:05:46     Q.   But the certificate of insurance is

19   17:05:48  issued to the employee; agreed?

20   17:05:50     A.   Not totally.  It is to the employee

21   17:05:54  and the participating employer.

22   17:06:00     Q.   Can we return to the section of

23   17:06:04  Exhibit 10, I think it is page 2 of your

24   17:06:06  exhibit, that talks about waiver of coverage?

25   17:06:10     A.   Yes.
```

```
 1   17:06:10    Q.   There is actually a number of boxes on
 2   17:06:12    Starmark's application form there, correct?
 3   17:06:16    A.   Yes.
 4   17:06:16    Q.   And would you agree that the box that
 5   17:06:22    states:  "Waiving all group coverage offered
 6   17:06:24    by my employer at this time" -- do you see
 7   17:06:28    that's in bold print there?
 8   17:06:32    A.   Yes.
 9   17:06:32    Q.   And that has a box to its immediate
10   17:06:34    left, right?
11   17:06:34    A.   Yes.
12   17:06:36    Q.   And Ms. Virtue has not checked that
13   17:06:38    box; are we agreed?
14   17:06:42         MR. VALCARCE:  Objection, form.
15   17:06:42         MR. FAYETTE:  Do you need the question
16   17:06:44    again?
17   17:06:44         THE WITNESS:  She has not checked that
18   17:06:46    box, true.
19   17:06:46    BY MR. FAYETTE:
20   17:06:46    Q.   And the next line down says -- the box
21   17:06:50    to the immediate left of the word "waiving,"
22   17:06:54    that's a box intended for an applicant to
23   17:06:58    check, right?
24   17:06:58    A.   Can you explain to me what you are
25   17:07:00    talking about again?  Where are you saying?
```

| | | |
|---|---|---|
| 1 | 17:07:02 | Q. There is bold print there, and the |
| 2 | 17:07:04 | bold print reads: "Waiving all group coverage |
| 3 | 17:07:06 | offered by my employer at this time," and |
| 4 | 17:07:08 | there is a box to the left of the word |
| 5 | 17:07:10 | "waiving." Do you see where I'm indicating? |
| 6 | 17:07:12 | A. Yes. |
| 7 | 17:07:12 | Q. Do we agree that that box is there to |
| 8 | 17:07:16 | either be checked or left blank? |
| 9 | 17:07:18 | A. Yes. |
| 10 | 17:07:20 | Q. And in this particular case, that box |
| 11 | 17:07:24 | is not marked in any way, right? |
| 12 | 17:07:26 | A. That's correct. |
| 13 | 17:07:28 | Q. And the next line down, the next line |
| 14 | 17:07:32 | says: "Medical coverage waived for," colon, |
| 15 | 17:07:36 | and to the left of the word "medical" there is |
| 16 | 17:07:38 | another shadowed box; agreed? |
| 17 | 17:07:40 | A. Agreed. |
| 18 | 17:07:40 | Q. And that box is there for the employee |
| 19 | 17:07:42 | or the applicant to either check or leave |
| 20 | 17:07:44 | blank; agreed? |
| 21 | 17:07:46 | A. Agreed. |
| 22 | 17:07:46 | Q. And the words to the right -- and |
| 23 | 17:07:54 | these boxes, the two boxes that I have just |
| 24 | 17:07:56 | discussed, these boxes have to be checked if |
| 25 | 17:07:58 | the employee wants to waive coverage, right? |

```
1   17:08:00      A.    Not necessarily.  They can check those

2   17:08:04   or the ones following that for employee,

3   17:08:06   spouse and children.

4   17:08:08      Q.    I understand that you are saying that,

5   17:08:10   but you agree that it doesn't say that

6   17:08:12   anywhere on this form?  Do we agree about

7   17:08:14   that?

8   17:08:14      A.    It doesn't say you have to check all.

9   17:08:28      Q.    It doesn't say the other way around

10  17:08:30   either, right?

11  17:08:32      A.    Right.

12  17:08:34      Q.    So in this case we are in agreement

13  17:08:36   that the box to the left of the medical

14  17:08:38   coverage waiver question, that Ms. Virtue has

15  17:08:40   not checked that, right?

16  17:08:42      A.    The box is not checked.

17  17:08:44      Q.    And then the same is true for the next

18  17:08:46   line down, the box to the immediate left of

19  17:08:48   the word "dental"?  That's not checked either,

20  17:08:50   right?

21  17:08:52      A.    That's right.

22  17:08:52      Q.    And we have already talked this

23  17:08:54   afternoon about the section that says:

24  17:08:56   "Reason for waiving coverage," colon.  That is

25  17:09:00   left incomplete as well, right?
```

```
 1   17:09:02     A.    Right.

 2   17:09:02     Q.    So would you agree that this section

 3   17:09:04   in the waiver of coverage section is

 4   17:09:06   incompletely filled out?

 5   17:09:08     A.    I disagree.  For our purpose, it is

 6   17:09:10   not.

 7   17:09:12     Q.    And you agree, though, that the manual

 8   17:09:18   that we discussed earlier this afternoon says

 9   17:09:22   that the reason section has to be filled out?

10   17:09:24   We agreed about that, right?

11   17:09:26         MR. VALCARCE:  Objection,

12   17:09:26   foundation -- excuse me.

13   17:09:30             Objection, beyond the scope.

14   17:09:32         THE WITNESS:  Yes.

15   17:09:34   BY MR. FAYETTE:

16   17:09:34     Q.    Yes, we agreed about that?

17   17:09:36         MR. VALCARCE:  Same objection.

18   17:09:38         MR. FAYETTE:  All right.

19   17:09:38   BY MR. FAYETTE:

20   17:09:40     Q.    Do you agree, Ms. Wendell, that this

21   17:09:54   section, page 2 of Exhibit 10, that we have

22   17:09:56   before us, do you agree, at a minimum, that

23   17:10:02   section is ambiguous?

24   17:10:04     A.    No.

25   17:10:04     Q.    Why not?
```

```
1    17:10:04    A.    I think it is clear.  If you check any
2    17:10:06  of the boxes, you are waiving coverage.
3    17:10:20    Q.    Remember earlier this afternoon you
4    17:10:24  mentioned letters that were sent, that would
5    17:10:26  be sent by Starmark to employees that waived
6    17:10:30  coverage?  Did I hear you mention that before?
7    17:10:32    A.    Letters to be sent?  I don't think I
8    17:10:36  mentioned that.
9    17:10:38    Q.    I thought you did, but I could be
10   17:10:40  mistaken.
11   17:10:40            Does Starmark send letters to
12   17:10:42  employees who waive?
13   17:10:44    A.    No.
14   17:10:44    Q.    Didn't I hear you say a moment ago
15   17:10:46  that "We would send a letter to employees who
16   17:10:48  waived coverage".?
17   17:10:50    A.    If I said that -- I don't believe I
18   17:10:52  did, but if I did, that's not right.  We don't
19   17:10:54  send letters to people that waive coverage.
20   17:10:58    Q.    Does Starmark make any attempt
21   17:11:02  to -- well, first of all, has it ever been
22   17:11:04  brought to your attention that a mistake has
23   17:11:08  been made by an applicant on this waiver
24   17:11:10  section previously?
25   17:11:12    A.    Not that I know of.
```

| | | |
|---|---|---|
| 1 | 17:11:14 | MR. VALCARCE:  I have got to put the |
| 2 | 17:11:16 | objection:  Objection, beyond the scope. |
| 3 | 17:11:18 | MR. FAYETTE:  And that means you get |
| 4 | 17:11:18 | to answer, Ms. Wendell. |
| 5 | 17:11:20 | THE WITNESS:  Not that I know of. |
| 6 | 17:11:22 | BY MR. FAYETTE: |
| 7 | 17:11:22 | Q.   But we are in agreement that -- |
| 8 | 17:11:30 | MR. VALCARCE:  I don't want to keep |
| 9 | 17:11:32 | interrupting you.  So why don't you give me |
| 10 | 17:11:36 | the courtesy of just letting me do an |
| 11 | 17:11:40 | objection, and I won't be waiving that |
| 12 | 17:11:42 | objection, that you are going way beyond the |
| 13 | 17:11:44 | scope of my very short and very limited |
| 14 | 17:11:48 | cross-examination.  If you will afford me that |
| 15 | 17:11:52 | continuing objection, I will stop interrupting |
| 16 | 17:11:54 | you, and we can move to strike it later. |
| 17 | 17:11:54 | MR. FAYETTE:  Granted.  Continuing |
| 18 | 17:11:56 | objection granted. |
| 19 | 17:11:56 | BY MR. FAYETTE: |
| 20 | 17:11:58 | Q.   We are in agreement that |
| 21 | 17:11:58 | Starmark -- I'm sorry, strike that. |
| 22 | 17:12:00 | Do you agree that the memorandum |
| 23 | 17:12:06 | from Mr. Alexander is inconsistent with this |
| 24 | 17:12:10 | waiver section as we have it before us on the |
| 25 | 17:12:12 | second page of Exhibit 10? |

```
 1   17:12:14      A.   As I said earlier, I don't believe it
 2   17:12:16   is inconsistent.
 3   17:12:16      Q.   You also agree that Starmark took no
 4   17:12:18   steps, though, to sort out the apparent
 5   17:12:22   inconsistency?
 6   17:12:22      A.   I don't believe there is an apparent
 7   17:12:24   inconsistency.  So we would not do anything to
 8   17:12:26   sort it out.
 9   17:12:28          MR. FAYETTE:  If you will bear with me
10   17:12:30   for a moment.
11   17:12:36              (Brief pause.)
12   17:12:46   BY MR. FAYETTE:
13   17:12:46      Q.   Assume Ms. Virtue had written back in
14   17:12:50   response to your June 2002 inquiry, and said:
15   17:12:54   "Wait a minute, I want coverage.  I never did
16   17:12:56   waive," and responded.  What would Starmark
17   17:12:58   have done?
18   17:12:58      A.   She would have to submit a new
19   17:13:00   application.
20   17:13:02      Q.   And then what?
21   17:13:02      A.   Depending on the date of that
22   17:13:04   application, she might have been considered
23   17:13:06   late.
24   17:13:08      Q.   And then what?
25   17:13:10      A.   Coverage would have been given
```

| | | |
|---|---|---|
| 1 | 17:13:14 | depending on how late that application was. |
| 2 | 17:13:16 | It depends on when she would have responded to |
| 3 | 17:13:18 | us. |
| 4 | 17:13:18 | Q.   All right.  Just one moment. |
| 5 | 17:13:24 | I'm going to ask you to pick up |
| 6 | 17:14:06 | the manual, Exhibit 5. |
| 7 | 17:14:16 | A.   Yes. |
| 8 | 17:14:22 | Q.   And on page 7 of that exhibit, and the |
| 9 | 17:14:28 | Bates stamp on that -- let me know when you |
| 10 | 17:14:30 | get there, and I will give you the Bates stamp |
| 11 | 17:14:30 | so I know that we are on the right page. |
| 12 | 17:14:30 | A.   I'm at page 7. |
| 13 | 17:14:32 | Q.   And the Bates stamp to the right is |
| 14 | 17:14:38 | 10945? |
| 15 | 17:14:38 | A.   Yes. |
| 16 | 17:14:38 | Q.   Section 3, "How", the first sentence |
| 17 | 17:14:44 | says:  "Each new employee must fully complete, |
| 18 | 17:14:48 | sign and date the employee enrollment form." |
| 19 | 17:14:52 | A.   Yes. |
| 20 | 17:14:52 | Q.   Are we in agreement that Ms. Virtue |
| 21 | 17:14:54 | did not fully complete, sign and date the |
| 22 | 17:14:58 | form? |
| 23 | 17:14:58 | A.   Correct. |
| 24 | 17:15:02 | Q.   Explain why that is. |
| 25 | 17:15:02 | A.   We didn't have information to attach |

96

```
 1   17:15:06   her to a group.

 2   17:15:12      Q.   You also agree that she did not fully

 3   17:15:14   complete the waiver section that we discussed

 4   17:15:16   a moment ago?

 5   17:15:16      A.   No, I don't agree with that.  I think

 6   17:15:18   it is completed to our satisfaction.

 7   17:15:24      Q.   But we are in agreement that there is

 8   17:15:26   three boxes that are not checked; agreed?

 9   17:15:30      A.   They are not checked.

10   17:15:32      Q.   And the reason is not given, right?

11   17:15:34      A.   Right.

12   17:15:38      Q.   Among those boxes that are not checked

13   17:15:40   is the one that has the ultimate statement:

14   17:15:42   "Waiving all group coverage offered by my

15   17:15:46   employer at this time."  That is not checked?

16   17:15:48      A.   Correct.

17   17:15:50      Q.   And the one below that that indicates

18   17:15:54   waiver of medical coverage, right?

19   17:15:56      A.   As I said before, that is not checked.

20   17:15:58         MR. VALCARCE:   Objection; asked and

21   17:16:00   answered, form.

22   17:16:02         MR. FAYETTE:   If I may have a moment,

23   17:16:08   please.

24   17:16:18   BY MR. FAYETTE:

25   17:16:20      Q.   Do you have page 12 of that manual
```

97

```
1   17:16:22   before you, miscellaneous administration?

2   17:16:24     A.   Yes.

3   17:16:26     Q.   Do you recall our discussion earlier

4   17:16:28   this afternoon about "clerical errors by the

5   17:16:30   employer or by us shall not invalidate

6   17:16:32   coverage of a person insured"?

7   17:16:34     A.   Yes.

8   17:16:36     Q.   Do you agree, if Ms. Virtue had

9   17:16:38   notified you that she did not intend to waive

10  17:16:40   coverage, and that the checking of those boxes

11  17:16:44   was a mere clerical error, that that would not

12  17:16:46   have been grounds to deny her coverage under

13  17:16:50   this policy?

14  17:16:50     A.   I'm sorry.  Say that again.

15  17:16:52     Q.   Do you agree that if Ms. Virtue had

16  17:16:54   responded, and told you that she did not

17  17:16:58   intend to waive coverage, and that the

18  17:17:00   checking of those boxes was mere clerical

19  17:17:04   error, that that would not have been grounds

20  17:17:06   to deny Ms. Virtue coverage?

21  17:17:08     A.   Would she have responded within the

22  17:17:10   ten days we afforded her?

23  17:17:12     Q.   Yes.

24  17:17:12     A.   So within those ten days?

25  17:17:14     Q.   Sure.
```

98

```
 1   17:17:16      A.   That we gave her that letter, she came
 2   17:17:18   back and said:  "I did not wish to waive
 3   17:17:20   coverage"?
 4   17:17:20      Q.   Right.  Assume that.
 5   17:17:22      A.   If I assume that, I would have asked
 6   17:17:24   her for a new application, signed and dated.
 7   17:17:30      Q.   And then what?
 8   17:17:30      A.   Then, depending on what the date on
 9   17:17:32   that application was, would depend whether or
10   17:17:36   not she was considered a late or timely
11   17:17:38   enrollee.
12   17:17:38      Q.   And then what?  Then you would have
13   17:17:42   what?
14   17:17:42      A.   Well, she would have been afforded
15   17:17:44   coverage with the preexisting conditions that
16   17:17:48   would go with that, either 12 or 18 months,
17   17:17:50   depending on when that date was, but it is
18   17:17:52   kind of hard to say not knowing what date that
19   17:17:56   would be.
20   17:17:56         MR. FAYETTE:  All right.  Thank you
21   17:18:02   for your patience, Ms. Wendell.  I think I'm
22   17:18:04   done.
23   17:18:04         MR. VALCARCE:  I think I have one
24   17:18:04   follow-up, Ms. Wendell.  Jim Valcarce here.
25   17:18:08         THE WITNESS:  Yes.
```

99

```
 1   17:18:08           F U R T H E R   E X A M I N A T I O N

 2   17:18:08   BY MR. VALCARCE:

 3   17:18:08      Q.   We are throwing out scenarios here.

 4   17:18:14   So I want to throw one out to you, a

 5   17:18:16   hypothetical.

 6   17:18:18      A.   Okay.

 7   17:18:18      Q.   If the group home had checked their

 8   17:18:20   bills and discovered that Ms. Virtue was not

 9   17:18:24   being covered, and they had contacted you and

10   17:18:26   said:  "We checked those boxes on the waiver

11   17:18:30   form, and it is wrong," could she have been

12   17:18:32   enrolled thereafter?

13   17:18:36      A.   It depends on the lapse in time.  It

14   17:18:38   depends on how long that was.

15   17:18:42      Q.   Those bills you said are sent out at

16   17:18:44   the first of the month; is that correct?

17   17:18:46      A.   Well, we send them out the 9th of the

18   17:18:50   prior month for the next month.

19   17:18:54      Q.   And in my scenario or my hypothetical,

20   17:19:00   if the group home had called you within that

21   17:19:02   ten days and told you that, would she have

22   17:19:04   been covered?

23   17:19:06      A.   It would have been the same.  No

24   17:19:06   matter whether or not it was the insured or

25   17:19:08   the group, if either one of them had responded
```

100

| | | |
|---|---|---|
| 1 | 17:19:10 | within those ten days, and told us that there |
| 2 | 17:19:12 | had been an error on the application or that |
| 3 | 17:19:16 | coverage should not have been waived, it would |
| 4 | 17:19:20 | be the same procedures.  We would have gone |
| 5 | 17:19:22 | back and looked at her application and asked |
| 6 | 17:19:22 | for a new application. |
| 7 | 17:19:26 | MR. VALCARCE:  Thank you.  I have no |
| 8 | 17:19:28 | further questions. |
| 9 | 17:19:28 | MR. FAYETTE:  Well, actually, I do |
| 10 | 17:19:30 | have one more. |
| 11 | 17:19:30 | F U R T H E R   E X A M I N A T I O N |
| 12 | 17:19:30 | BY MR. FAYETTE: |
| 13 | 17:19:30 | Q.  When did the first bill show up in |
| 14 | 17:19:32 | your file to Starmark following this period in |
| 15 | 17:19:36 | May of 2002? |
| 16 | 17:19:38 | A.  I'm sorry, say that again?  When does |
| 17 | 17:19:40 | the what? |
| 18 | 17:19:42 | Q.  When did CGH get their first bill |
| 19 | 17:19:48 | following your receipt of this application on |
| 20 | 17:19:50 | May 13th of 2002? |
| 21 | 17:19:54 | A.  It depends on when we would have |
| 22 | 17:19:56 | gotten response from Ms. Virtue.  If we would |
| 23 | 17:19:58 | have added her to the system on May -- let's |
| 24 | 17:20:02 | say we would have added her to the system on |
| 25 | 17:20:04 | May 15th or 13th, when we received this.  If |

```
 1   17:20:06   that was the case, if her application had come
 2   17:20:10   in clean, with everything on it, and we added
 3   17:20:12   her to the system on May 15th, she would have
 4   17:20:14   shown up on a July bill.
 5   17:20:20       Q.   So you agree that the status on new
 6   17:20:24   employee addition, that I believe is
 7   17:20:28   encompassed within Exhibit 10 --
 8   17:20:32       A.   Yes.  What about that?
 9   17:20:34       Q.   -- that's not sent to Bethel Group
10   17:20:36   Home's address, correct?  That's sent to the
11   17:20:40   address you have for the prospective
12   17:20:42   applicant; are we agreed about that?
13   17:20:42       A.   As I have previously stated, that is
14   17:20:46   the address that came off of the enrollment
15   17:20:48   form.
16   17:20:48       Q.   And was not copied to the employer?
17   17:20:52       A.   Not to my knowledge.
18   17:20:54       Q.   And you have no record of it being
19   17:20:56   sent to the employer?
20   17:20:58       A.   No.  We did not have the employer's
21   17:21:00   group number.
22   17:21:06       Q.   So would you agree you have no
23   17:21:08   evidence in that ten-day period that BGH was
24   17:21:12   aware of the status of Ms. Virtue's
25   17:21:16   application?
```

```
 1   17:21:16      A.    Not that I know of.

 2   17:21:20            MR. FAYETTE:  Thank you.  Thank you.

 3   17:21:22                Nothing further.

 4   17:21:24            MR. VALCARCE:  Ms. Wendell, I have a

 5   17:21:28   couple quick questions.

 6   17:21:28         F U R T H E R   E X A M I N A T I O N

 7   17:21:28   BY MR. VALCARCE:

 8   17:21:28      Q.    On Exhibit 10, it looks like Bethel

 9   17:21:32   Group Home mailed this to you on April 17th;

10   17:21:36   is that correct, or at least that's the date

11   17:21:36   on the letter?

12   17:21:36      A.    That's the date on the letter.

13   17:21:38      Q.    Any idea why it took so long to get

14   17:21:42   there?  Do you have any idea why it shows up

15   17:21:44   on May 13th?

16   17:21:46      A.    I do not.  I don't know.  The date

17   17:21:48   that's stamped there is the date it would have

18   17:21:50   come to our mail services.  So I don't know.

19   17:21:52      Q.    And is there any documents involving

20   17:21:56   Melissa Virtue that show that the group home

21   17:22:00   followed up on this application, called,

22   17:22:02   checked, or determined the status of it at any

23   17:22:04   point?

24   17:22:04      A.    I have nothing.

25   17:22:08            MR. VALCARCE:  Thank you.  No further
```

103

| | | |
|---|---|---|
| 1 | 17:22:08 | questions. |
| 2 | 17:22:10 | MR. FAYETTE: I have got no further |
| 3 | 17:22:12 | questions for Ms. Wendell. I do wish to |
| 4 | 17:22:16 | discuss with Mr. Mc Daniel about Ms. Gregory |
| 5 | 17:22:18 | and possibly arranging, hopefully, for her |
| 6 | 17:22:22 | deposition towards the end of this week. |
| 7 | 17:22:24 | Mr. Mc Daniel, are you prepared |
| 8 | 17:22:26 | to talk about that now? |
| 9 | 17:22:28 | MR. MC DANIEL: I haven't talked to |
| 10 | 17:22:28 | Ms. Gregory. I talked to management in that |
| 11 | 17:22:32 | office, and they were going to advise |
| 12 | 17:22:36 | Ms. Gregory that she may be asked to comment |
| 13 | 17:22:38 | on procedures, but I don't know if that's |
| 14 | 17:22:42 | within the scope of what you have previously |
| 15 | 17:22:44 | asked us to provide witnesses on. |
| 16 | 17:22:48 | MR. VALCARCE: I'm going to hang up, |
| 17 | 17:22:50 | Steve, and let you guys figure this out. |
| 18 | 17:22:54 | Ms. Wendell, are you still there? |
| 19 | 17:22:58 | THE WITNESS: Yes. |
| 20 | 17:22:58 | MR. VALCARCE: Thank you for your |
| 21 | 17:22:58 | time. You're a great witness. I can see why |
| 22 | 17:22:58 | you are a vice president. Thank you for your |
| 23 | 17:23:00 | time. |
| 24 | 17:23:00 | THE WITNESS: You're welcome. |
| 25 | 17:23:00 | MR. FAYETTE: Ms. Wendell, thank you |

```
1    17:23:02   for your patience with me.
2    17:23:04        MR. MC DANIEL:  I wanted to comment on
3    17:23:06   we would like Bernie to read and sign her
4    17:23:08   deposition.
5    17:23:16        MR. FAYETTE:  Yes.  I think that's
6    17:23:18   Ms. Wendell's call.
7    17:23:30        THE WITNESS:  I want to read and sign
8    17:23:32   it.
9    17:23:38        MR. FAYETTE:  Mr. Mc Daniel, I want to
10   17:23:40   return to Ms. Gregory.  Can we agree to
11   17:23:42   communicate tomorrow about that issue since we
12   17:23:44   are fast on the close of our discovery here?
13   17:23:48        MR. MC DANIEL:  We can try to, but I'm
14   17:23:50   going to be in Pennsylvania in a deposition
15   17:23:52   tomorrow.
16   17:23:54        MR. FAYETTE:  Oh, dear.
17   17:23:54        All right.  Is there anyone else
18   17:23:56   with whom I could communicate tomorrow?
19   17:24:00        MR. MC DANIEL:  I'm going to contact
20   17:24:02   that office tomorrow, as soon as I can.  Then
21   17:24:12   I can try to give you a call, but I can't
22   17:24:14   guarantee I will be able to hook up with you
23   17:24:16   because I don't know what my schedule is going
24   17:24:18   to be like, and we have bad weather coming in.
25   17:24:22   I already know my flight is delayed or I would
```

```
 1   17:24:24   have adjourned this because we went way past
 2   17:24:30   our scheduled hour.
 3   17:24:30          MR. FAYETTE:  We did, and I appreciate
 4   17:24:30   your availability.
 5   17:24:32          If you can give me a call as soon
 6   17:24:34   as you know about Ms. Gregory's availability,
 7   17:24:36   that would be appreciated.  Thank you, and
 8   17:24:38   thank you for the courtesy of being available.
 9   17:24:42          MR. JACOBSON:  Jim, you want all of
10   17:24:42   these exhibits attached to the record,
11   17:24:46   correct?
12   17:24:46          MR. FAYETTE:  Yes.
13   17:24:48          MR. JACOBSON:  And you are ordering
14   17:24:48   this transcript, correct?
15   17:24:50          MR. FAYETTE:  Yes.
16   17:25:20          MR. JACOBSON:  Let the record reflect
17   17:25:22   that I have tendered Exhibits 1, 2, 3, 4, 5, 6
18   17:25:28   and 9 and 10 to the court reporter for
19   17:25:32   attaching to the original transcript.
20   17:25:36          That should do it.
21   17:25:38          MR. FAYETTE:  Okay.  Thank you.
22   17:25:38          (Ending Time:  5:25 p.m.)
23
24
25
```

1   STATE OF _____)
2   COUNTY OF _____) SS.
3
4
5
6
7          I, the undersigned, declare under penalty
8   of perjury that I have read the foregoing transcript,
9   and I have made any corrections, additions or
10  deletions that I was desirous of making; that the
11  foregoing is a true and correct transcript of
12  my testimony contained therein.
13          EXECUTED this _____ day of _____,
14  _____, at _____, _____.
15                      (City)            (State)
16
17
18                      _____
19                          BERNADINE WENDELL
20
21
22
23
24
25

107

```
 1   STATE OF ILLINOIS)

 2                    )  SS.

 3   COUNTY OF MCHENRY)

 4      I, HEATHER PERKINS, Certified Shorthand

 5   Reporter in and for the County of McHenry and

 6   State of Illinois, do hereby certify that

 7   BERNADETTE WENDELL was first duly sworn to

 8   testify the whole truth and that the above

 9   deposition was recorded stenographically by

10   me, and was reduced to typewriting under my

11   personal direction.

12      I further certify that the said deposition

13   was taken at the time and place specified.

14      I further certify that I am not a relative

15   or employee or attorney or counsel of any of

16   the parties, nor a relative or employee of

17   such attorney or counsel or financially

18   interested directly or indirectly in this

19   action.

20      In witness whereof, I have hereunto set my

21   hand and affixed my seal of office at

22   Algonquin, Illinois, this  11th    day of

23   January, A.D., 2005.

24   _____

25   Heather Perkins-Reiva, C.S.R. No. 084-003714
```

108