Page 1

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

FOURTH JUDICIAL DISTRICT AT BETHEL

MELISSA VIRTUE, )
)
      Plaintiff, )
)
v. )
)
BETHEL GROUP HOME INC., )
)
      Defendant. )
_____)

Case No. 4BE-04-19 Civil


VIDEOTAPE DEPOSITION OF PAUL JANOWIEC

Pages 1 through 248, Inclusive

Taken: Thursday, December 2, 2004

Place: Juneau, Alaska

### Page 71

1  your duties?
2  A.  Well, I also functioned in a clinical
3  role, too, and at least for the first couple of
4  years would provide counseling services to kids.
5  Actually, that continued all the way through the end
6  because I was doing group at the end.
7       So I would provide individual
8  counseling and group counseling for kids, you know,
9  and then talk to kids and their families -- usually
10 by phone, the families.
11      So there were two components to my
12 role, one being sort of a helping component, and
13 then the other --
14      MS. MAGURA: Speak up, please.
15 A.  -- the other being an administrative
16 component. And as the executive director, I wrote
17 all the grants. Basically, you know, provided the
18 administrative functioning for the corporation,
19 reported to the board of directors.
20      You know, the people that I
21 supervised -- initially in the beginning I
22 supervised all of the youth counselors at the group
23 home, and then as we, you know, increased in size,
24 you know, we had program directors, and so I
25 supervised those people. But I -- you know, I

### Page 72

1  signed off on all the evaluations of personnel,
2  hired most of the people, you know, did -- so
3  personnel management certainly was, you know, a
4  component.
5       Financial budgetary management,
6  facility management. The building was a wreck when
7  we got it -- when I got it. So, you know,
8  responsible for all -- and doing -- you know,
9  setting up the program, too, that was at the group
10 home. I mean, the program initially when I arrived
11 was weak, and so, you know, improving that program
12 and kind of reforming it.
13 Q.  To whom did you report? Who supervised
14 or hired and fired you?
15 A.  The board of directors.
16 Q.  Okay. And were you the chief executive
17 officer of this corporation?
18 A.  Yes.
19 Q.  I want to focus on the period from
20 January to May of 2002.
21 A.  January of --
22 Q.  January through May of 2002. That's the
23 period of time in which Melissa Virtue worked at the
24 group home generally. What was the staffing at that
25 time?

### Page 73

1  A.  The staffing at the group home per se?
2  Q.  Right.
3  A.  You mean who was on staff?
4  Q.  Yes. Or not -- well, I am interested in
5  the identity of the individuals, but I want to --
6  what I'm looking for is a description of the
7  positions.
8  A.  Of the organizational management?
9  Q.  Yeah.
10 A.  You know, I was the executive director,
11 and there were -- there was a program manager who
12 reported directly to me, and I believe there was a
13 clinician who reported to me. And reporting to the
14 program director -- program manager then were the
15 youth counselors and probably a maintenance guy.
16 And besides the program managers who reported
17 directly to me, then there was also a business
18 manager.
19 Q.  Okay. So executive director. Under the
20 executive director were the program manager, the
21 clinician, and the business manager; is that right?
22 A.  Yes.
23 Q.  And then there was -- there were youth
24 counselors?
25 A.  Yes.

### Page 74

1  Q.  They reported to the program manager?
2  A.  Yes. There was an assistant program
3  manager also, I believe, or it came into existence
4  around that time so that there was always someone
5  who was supervisory, you know, there.
6  Q.  Okay. And there was a maintenance
7  person?
8  A.  Yeah.
9  Q.  Any other type of staff, like
10 secretaries, receptionists, anything like that?
11 A.  No. No.
12 Q.  Okay. And so how many people were on
13 staff during this period of the spring 2002?
14 A.  20, maybe. Well, at the group home?
15 Q.  Yes.
16 A.  At the group home, probably eight or
17 nine, something like that. I mean, that doesn't
18 include me and the business manager, probably.
19 Q.  This person named Kenneth Alexander,
20 what was his position?
21 A.  During --
22 Q.  In the first half of 2002.
23 A.  He was a -- first half of 2002? He held
24 two positions. One was as a temporary accountant --
25      MS. MAGURA: I'm having trouble

Page 139

1  Group Home?
2  A. I did.
3  Q. Okay.
4  A. Initially he was -- came to us through a
5  temporary service.
6  Q. Okay.
7  A. Because we didn't have our -- a business
8  manager, so we had to have somebody who could do the
9  books.
10  Q. What kind of process -- when did you
11  hire him?
12  A. That's what I was saying -- I said. I
13  don't remember the exact date that, you know, he
14  went from being a temporary to being an employee.
15  Q. Okay.
16  A. I don't remember that exact date.
17  Probably it's in his personnel file, which I don't
18  have access to.
19  Q. Is that file likely to be among those
20  that were sent --
21  A. Likely.
22  Q. -- from Bethel to Juneau in October?
23  A. Likely.
24  Q. Okay. Do you know whether that file,
25  that personnel file, was provided to your lawyers in

Page 140

1  this case?
2  A. I -- no, it wasn't.
3  Q. It was not?
4  A. I don't believe so.
5  Q. Okay. When was he hired?
6  A. You just asked me that, and I didn't
7  know.
8  Q. Oh.
9  A. He came to us as a temporary employee,
10  so he was hired by the temporary service and given
11  to us then as a bookkeeper, sort of a temporary
12  bookkeeper. And he worked for a while, and then we
13  hired him.
14  Q. Okay.
15  A. But I have forgotten the exact dates.
16  Q. But this is sometime after '99 when you
17  started working?
18  A. Oh, yeah. Yeah. Yeah. It was -- I
19  mean, he -- the position had been vacated by a
20  previous person, and so then there was a gap. And
21  so then he was brought in.
22  Q. Did you do any kind of background
23  investigation on Mr. Alexander before hiring him?
24  A. No, because that was the temporary
25  people that did that. Other than, I mean --

Page 141

1  Q. Did they -- I'm sorry. Go ahead.
2  A. The temporary people presumably would
3  have found out who he was and all of that.
4  Q. So you relied on whatever background
5  check they did?
6  A. Yeah. Yes. I mean, we had -- we had
7  forms that he had to fill out that the state, the --
8  regulations required us to do, and so, you know, he
9  filled out those forms as far as I know.
10  Q. Did the state require the Bethel Group
11  Home to do a criminal record background check --
12  A. Yes.
13  Q. -- of any employee?
14  A. Yes.
15  Q. Of every employee?
16  A. Yes.
17  Q. So did you do a criminal background
18  check of Mr. Alexander?
19  A. Not that I recall.
20  Q. When he --
21  A. We probably should have.
22  Q. When he worked for Bethel Group Home did
23  you know whether or not he had a criminal record?
24  A. No.
25  Q. Did you learn anything about that since

Page 142

1  you hired him?
2  A. Oh, yes. Oh, yes.
3  Q. What did you learn?
4  A. We found out that he had -- that he's a
5  criminal, and that he had previous -- you know, he
6  was a criminal. He committed a crime while in our
7  employ, and I found out that he apparently had --
8  you know, had committed a crime before.
9  Q. What crime did he commit in your employ?
10  A. He stole a computer from us and stole
11  money. He changed payroll records to pay himself
12  more money.
13  Q. When did he do that?
14  A. When?
15  Q. Yes.
16  A. I don't --
17  Q. Well, I mean, when did you learn this,
18  is my point.
19  A. When it was brought to my attention by a
20  person who was then kind of in the role of, you
21  know, bookkeeper after him.
22  Q. Oh.
23  A. Or during his -- at the end of his time.
24  Q. And who was that person?
25  A. Ben Glover.

37 (Pages 139 to 142)

Page 143

1  Q.  Do you know the time frame of what --
2  approximate time frame is of when Mr. Alexander left
3  and when Glover came on board?
4  A.  It is probably -- it is in '92 -- or
5  2002. It's probably like -- you know, like maybe
6  September, October of 2002, something like that. I
7  mean, there was a case in Bethel. His case was done
8  in Bethel. He apparently then committed a
9  subsequent federal crime and was prosecuted
10 federally, I guess.
11  Q.  But this criminal -- this criminal
12 conduct that you are talking about, and the
13 termination of Mr. Alexander, did that occur after
14 Ms. Virtue left in --
15  A.  Yes.
16  Q.  -- in May of 2002?
17  A.  I believe so.
18  Q.  Okay. So at the time she was there, he
19 was still acting as the temporary business
20 manager --
21  A.  Yes. Yes.
22  Q.  -- or whatever you said before?
23  A.  Yes. Yes.
24  Q.  Now, you said you never saw item 8A
25 before, but you have seen item 8B before. What can

Page 144

1  you tell me about item 8B, the Employee Enrollment
2  Form?
3  A.  What can I tell you about it?
4  Q.  Yes, this particular one.
5  A.  This particular one?
6  Q.  Filled out by Melissa Virtue.
7  A.  I mean, I told you that, you know, I
8  wasn't familiar with the details of the form, of her
9  having filled out the form. So, you know --
10  Q.  Did you have any part in her filling out
11 the form?
12  A.  No. I mean, other than it was deposited
13 on my desk.
14  Q.  Okay. Do you know whether all the
15 handwriting or markings on the form are hers or
16 anyone else's?
17  A.  No, I have no idea.
18  Q.  On this form there are a number of
19 places where you -- where the person filling it out
20 chooses one of several answers to a subject.
21  A.  Okay.
22  Q.  For example, under the box that says
23 "Sex," there are two choices, male and female?
24  A.  Where are you looking at that?
25  Q.  On the first page under the name and so

Page 145

1  forth.
2  A.  Oh, okay. Right. I see that.
3  Q.  So there is one of two boxes to be
4  marked?
5  A.  Right.
6  Q.  Similarly, with "Marital Status," there
7  is one of two boxes -- or there are two boxes, and
8  presumably the employee marks one of the two?
9  A.  Yes, I see that.
10  Q.  Because they are alternatives?
11  A.  Yes, I see that.
12  Q.  Okay. And how does it appear to you
13 that those boxes were marked on this form, by what
14 kind of sign?
15  A.  It kind of looks like a -- like a -- not
16 a felt pen, but kind of one of those roller -- you
17 know, kind of roller pens or, you know -- it is
18 not -- they are not markers, but they are not
19 ballpoint pens. They are kind of in between. They
20 are, you know, a type of marker that rolls the ink.
21  Q.  And how has she marked the various boxes
22 where there are choices to be made, by what sort of
23 symbol?
24  A.  With an X.
25  Q.  Okay. She didn't check it. She didn't

Page 146

1  blacken the box. She put an X over it, correct?
2  A.  That's correct.
3      MR. FAYETTE:  Well, object to the
4  form. Lack of foundation --
5      MR. COOKE:  Speaks for itself. I
6  know.
7      MR. FAYETTE:  Well, that, plus he
8  doesn't know who -- I'm trying to avoid a speaking
9  objection, but objection. Form.
10 BY MR. COOKE:
11  Q.  On the third page of this document --
12  A.  Can I --
13  Q.  I'm sorry. Go ahead.
14  A.  Now, on page -- under prior -- proof of
15 prior coverage, in the second line, okay, see, it
16 says, "If yes complete the following." Then in
17 parens, "If insured with more than one carrier in
18 the past 12 months, please attach certificates of
19 credible coverage from prior plans." The insurance
20 companies are asking questions, and they want you to
21 submit that document with the application,
22 presumably.
23  Q.  Are you -- is this something you know
24 something about, or are you just telling us what
25 someone else has --

38 (Pages 143 to 146)