**EXHIBIT I**
**Paul Janowiec Deposition**
(Selected Pages)

Page 1

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

FOURTH JUDICIAL DISTRICT AT BETHEL

MELISSA VIRTUE, )
)
    Plaintiff, )
)
v. )
)
BETHEL GROUP HOME INC., )
)
    Defendant. )
_____ )



Case No. 4BE-04-19 Civil

VIDEOTAPE DEPOSITION OF PAUL JANOWIEC

Pages 1 through 248, Inclusive

Taken: Thursday, December 2, 2004

Place: Juneau, Alaska

Exhibit   I

Page_____of_____Pages

Page 123

1 particular --
2  A.  Well, I signed the initial document, and
3 this was sort of a template, you know, that was
4 available -- I mean, it looks like Rob Lannoye
5 and/or Nancy Wilkinson, you know, hired her.
6  Q.  Okay. She was hired for what position?
7  A.  Youth counselor. I mean, I didn't fill
8 this form out.
9  Q.  The date of her hire was 1-21-02?
10  A.  1 -- yes.
11  Q.  January 21, '02?
12  A.  Yes.
13  Q.  So under that 90-day qualification
14 period, introductory period, when would she become
15 eligible for coverage under the Bethel Group Home's
16 health plan?
17  A.  She would -- she would apply after her
18 probationary period of -- assuming that she
19 successfully completed the probationary period, she
20 would be eligible to apply, you know, on -- January,
21 February, March -- to April 22nd, you know, would be
22 the first day that she could apply.
23       That doesn't mean that she would
24 have health insurance. That means that, you know,
25 she was supposed to come in and talk to the business

Page 124

1 manager, and, you know, and apply and fill out the
2 forms and all that kind of stuff. And it would be
3 then subsequently mailed --
4  Q.  Is there anything wrong with her doing
5 that before the end of the 90-day period to get it
6 in the mail so it would be -- it could go into
7 effect at the end of the 90-day period?
8  A.  Well, it couldn't go into effect before
9 that because the premium hadn't been paid. Before
10 you -- before insurance goes into effect, you
11 have -- they -- first of all, they --
12  Q.  That wasn't my question.
13  A.  All right.
14  Q.  My question was: Is there any wrong
15 with applying --
16  A.  No. No.
17  Q.  -- before the end of the 90-day period?
18  A.  No. No.
19  Q.  Okay.
20  A.  It wouldn't be acted on, though.
21  Q.  Okay. I understand. Now, did she
22 successfully complete the 90-day introductory
23 period?
24  A.  Yes.
25  Q.  Did you retain her as an employee beyond

Page 125

1 this 90-day period?
2  A.  Yes. Yes.
3  Q.  How was her performance?
4  A.  Good.
5  Q.  What was her job as a youth counselor?
6 What did she do?
7  A.  She, you know, basically was responsible
8 for -- she was in direct contact with kids that were
9 in residence, in treatment there. And she, you
10 know, assisted them with, you know, activities of
11 daily living, you know, meaning that she, you know,
12 helped them follow the routine that was in place,
13 you know, for all of the activities that, you know,
14 you have to do: Get up on time, you know, and get
15 dressed, et cetera.
16       She also would be a counselor to
17 kids and would, you know, have verbal conversations
18 with them, you know, about issues that -- you know,
19 things that they wanted to talk to. So it was a
20 wide-ranging kind of a job.
21  Q.  Okay. When she completed this 90-day
22 period, did she get a pay increase as you testified
23 was customary?
24  A.  I -- she might have. She must. You
25 know, I think she did.

Page 126

1  Q.  Would information like that be in her
2 personnel file?
3  A.  Yeah, it should be.
4  Q.  Would there be other documents likely in
5 her personnel file in addition to this letter of
6 hire?
7  A.  Well, other than introduct -- a letter
8 of hire, yeah. There would be things like her
9 application for the job.
10  Q.  Oh. Now, I thought you mentioned
11 earlier that the personnel files were among the
12 things that were transferred from Bethel to Juneau?
13  A.  Yes.
14  Q.  Would that include Melissa Virtue's
15 personnel file?
16  A.  I think so. I mean, I don't have -- all
17 of the personnel files went -- went to the state.
18  Q.  Okay. So is it possible there are other
19 documents in that file that your lawyers don't have?
20  A.  Yes.
21  Q.  Okay. But you don't know what those
22 are?
23  A.  No. I mean, you know, that of Melissa
24 Virtue's documents?
25  Q.  Right.

33 (Pages 123 to 126)

Paul Janowiec * 12-2-2004
Virtue v. Bethel Group Home, Inc. * 4BE-04-19

Page 147

1  A. No, because you had asked previous
2  questions about when -- you know, having to provide
3  proof that you had insurance. That's -- I'm
4  showing -- that's like on their form.
5  Q. I can read the form.
6  A. I know.
7  Q. Okay. There is a section that appears
8  both on page 3 and page 4 of this document. The
9  title of the section is "Waiver of Coverage." Do
10 you see that part?
11 A. Yes.
12 Q. Okay. And there are some boxes similar
13 to the boxes on other parts of the form?
14 A. Uh-huh.
15 Q. Correct?
16 A. Uh-huh.
17 Q. Do you notice anything different about
18 the markings in that section of the form as compared
19 with the rest of the form?
20 A. Yes, they are checkmarks, not Xs.
21 Q. Do you have any idea how those
22 checkmarks get there -- got there?
23 A. I have no idea.
24 Q. Now, what do you recall about having
25 seen Ms. Virtue's form before? When and where was

Page 148

1  that, this document?
2  A. She, you know, I believe gave me -- she
3  gave me the application, and I put it on my desk.
4  And, you know, I reviewed it like you are, you know,
5  but not in any depth, where I, you know, saw
6  anything. I mean, I just kind of breezed through it
7  and said, "Yup, there is her application." And then
8  I gave it to Mr. Alexander.
9  Q. Was there any -- what was the purpose of
10 giving to it Alexander?
11 A. So he would send it in to the insurance
12 company, you know. She -- by the time -- I mean,
13 she gave that -- gave it to me and so, I mean, the
14 reason that they came to me was because we had an
15 employee who was turned down for insurance because
16 he had filled out the form incompletely. So we
17 added this step, you know, to -- you know, where
18 they would send it to me and so, you know, it was
19 kind of a bureaucratic step to make sure that, you
20 know, they filled it out. And so then I would, you
21 know, hand it to the business manager and they would
22 mail it in.
23 Q. Oh, so it was your practice to see -- to
24 review this form to make sure it was filled out
25 correctly by the employee?

Page 149

1  A. That it was fully -- completely filled
2  out, because we had an employee who hadn't filled it
3  out. So --
4  Q. Okay.
5  A. -- you know, I was supposed to, like,
6  look and see that it was completely filled out,
7  signed, you know, with the date and, you know, stuff
8  like that.
9  Q. Now, this form on page 3 and 4 appears
10 to have a signature and a date on it of 4 -- the
11 date is 4-17-02.
12 A. Uh-huh.
13 Q. Do you know when after that date you got
14 this form to review?
15 A. Not -- not offhand. It was -- I assume
16 that it was around that date because she -- I think
17 she gave it to me.
18 Q. Okay. And do you know how long it
19 stayed in your possession for this review?
20 A. Probably sat on my desk or was on my
21 desk, you know, to be reviewed for, you know, a
22 week, maybe.
23 Q. Why would it take a week to review the
24 form?
25 A. Because I had a lot of other work to do.

Page 150

1  I mean, I was the chief executive of a corporation,
2  and I was dealing with kids on an hour-by-hour,
3  day-to-day basis. And so this was, you know, a
4  routine kind of matter, and that, you know, she --
5  following the completion of her probationary period,
6  which I -- you know, was like the 21st, okay?
7      I mean, she submitted this before,
8  you know, it could be -- would be mailed in. So it
9  just sat on my desk, you know, so that -- you know,
10 I mean, what seemed to be more important, she got a
11 promotion at the time, and so -- and more money.
12     And so, you know, that -- that was
13 probably the more salient point to her and everyone
14 else.
15 Q. How do you know that? How do you know
16 what she was thinking?
17 A. I have no idea. I mean, you know, I
18 didn't ask her to rate anything, but, you know, she
19 was a good employee, and it was important that we
20 evaluated people, so -- and, you know -- and we were
21 promoting her.
22     So, I mean -- and this form
23 wouldn't, you know, I mean, presumably they -- you
24 know, I mean, it wouldn't be mailed under the best
25 of circumstances until after the completion of her

Glacier Stenographic Reporters Inc.
glaciersteno@gci.net * 907.789.9028

Paul Janowiec * 12-2-2004
Virtue v. Bethel Group Home, Inc. * 4BE-04-19

### Page 151

1  probationary period. No one would ever get that
2  mailed.
3     Q.   Okay. But your testimony was earlier
4  that her probationary period was complete 90 days
5  after her date of hire, correct?
6     A.   That's correct.
7     Q.   So that would have been April 21, 2002.
8  I believe that's what you said?
9     A.   That's correct.
10    Q.   At that point she was eligible to
11 receive the health coverage benefit?
12    A.   She was eligible to apply. I mean, I
13 couldn't -- we are quibbling over words, but the
14 insurance company -- we would have to get a bill for
15 her premium, and, you know, once she enrolled, a
16 person enrolled --
17    Q.   I understand.
18    A.   Right.
19    Q.   Okay. As far as her eligibility to
20 apply, is there anything else that she was required
21 to do to apply for health insurance other than fill
22 out this employment enrollee form?
23    A.   According to the policy she was supposed
24 to sit down and meet with the business manager and
25 determine what the coverage would be, you know, and

### Page 152

1  all that.
2     Q.   Do you know whether or not she did that?
3     A.   I have no idea. I don't think that she
4  did. I mean, I -- this ended up on my desk, you
5  know, and so then -- you know, the next thing I
6  knew, you know, she was in the hospital.
7     Q.   But by the time that she was eligible
8  for coverage, or, as you say, eligible to apply for
9  coverage, April 21st, 2002, this Employee Enrollment
10 Form, Number 8B, was still on your desk, correct?
11    A.   Yes.
12    Q.   And it remained on your desk for several
13 days thereafter, at least?
14    A.   Yes.
15    Q.   When was this -- after you had reviewed
16 this form, did you review this form and approve it?
17    A.   Like I say, I didn't, you know, go
18 through line by line, sentence by sentence, and, you
19 know, her marks, each mark, you know. I mean, I
20 just, you know, sort of briefly scanned it and
21 handed it to Kenneth Alexander.
22    Q.   Is there anything on the form that notes
23 that you reviewed it?
24    A.   No.
25    Q.   Was it -- when you do this review

### Page 153

1  process, is there any other kind of paperwork that
2  is generated to show that you have reviewed it and
3  approved it?
4     A.   No.
5     Q.   So that was not part of your business
6  practice to --
7     A.   No. No.
8     Q.   Okay. So is there any way at all that
9  you or we can prove whether or when you reviewed and
10 approved this form?
11    A.   No.
12    Q.   Okay. And what did you do with this
13 form after you approved it?
14    A.   I gave it to Ken Alexander.
15    Q.   Okay. And what was he supposed to do
16 with it?
17    A.   He was just supposed to mail it in to
18 the insurance company.
19    Q.   Did you tell him to do that?
20    A.   Yeah.
21    Q.   Do you know whether or not he did it?
22    A.   No.
23    Q.   No, you don't know?
24    A.   No, I have no idea.
25    Q.   Okay. What is the process that Bethel

### Page 154

1  Group Home would go through to send an enrollment
2  form to your insurance company?
3     A.   I mean, after the person -- after the
4  probationary period, a person would, you know, get
5  the form, and they would fill it out. And, you
6  know, I mean, they -- I mean, they probably would
7  get the form from the business manager, and then
8  they would fill it out and, you know -- I mean,
9  after a period -- after a while, like I said, after
10 this one employee -- you know, the form didn't get
11 filled out all the -- and that took a long time to
12 find out about that, that that was why the guy
13 didn't get insurance from the insurance company.
14    Q.   Was this before or after Mrs. Virtue
15 resigned?
16    A.   I believe it was before. It was Jody
17 Sleppy. He filled out the form. You know, we were
18 going to a new insurance thing, and the broker,
19 underwriter, and -- you know, he submitted a form,
20 and it didn't get -- it wasn't filled out properly.
21 So, you know, we added this extra step where
22 presumably I was supposed to look at the forms. And
23 then I would hand it to the business manager, and
24 the business manager would send it to the insurance
25 company.

Paul Janowiec * 12-2-2004
Virtue v. Bethel Group Home, Inc. * 4BE-04-19

Page 159

1  wasn't -- those bills weren't being paid by the
2  insurance company?
3      A.   Wasn't that when I discovered it?
4      Q.   Yes.
5      A.   No. It mean, it was handed to Ken
6  Alexander. I mean, we -- you know, I mean, you are
7  asking what is the time line between the time that
8  she was in the hospital and the time that this form
9  was sent in to the insurance company?
10     Q.   That's not what I'm asking. I'm asking
11 whether it is true that this form did not -- this
12 form was still in your office at the time that
13 Ms. Virtue was receiving medical treatment and
14 seeking to have her medical bills paid by the health
15 insurance company for Bethel Group Home, and those
16 bills weren't getting paid because they had no
17 record of her enrollment.
18     A.   What -- do you -- I don't know when --
19 what date, you know, Melissa then entered the
20 hospital or was transported from Bethel to -- to
21 Anchorage. What date was that?
22     Q.   I don't have that date myself.
23     A.   So, I mean --
24     Q.   My point is, isn't it true that you
25 discovered this form in your office when questions

Page 160

1  began to arise about whether or not she was under
2  the group home's health insurance plan?
3      A.   It wasn't that I discovered it. I just
4  said that I was aware of the fact that the form was
5  on my desk all the time. I mean, it wasn't -- you
6  are, like, saying it -- you are trying to make the
7  case that it was lost. It wasn't lost. It never
8  was lost. I mean, it was on my desk.
9      Q.   But the insurance company didn't have
10 it?
11     A.   No, the insurance company didn't have
12 it. I mean, as a matter of routine -- routine if --
13 I mean, a form, you know, could sit on my desk, you
14 know, for various times, you know, depending on what
15 I was doing. I mean, if I was in the middle of
16 writing grants, there would be no form that would --
17 you know, they would sit there for a period of time
18 until I finished writing the grants. Okay?
19          There wasn't any kind of policy
20 that -- and there isn't any kind of policy that
21 says, you know, when forms move -- go from my desk
22 to someone else's desk or any of that kind of stuff.
23          So, I mean, routinely things were
24 late because there was so much work to do. If
25 Melissa hadn't ever gone and gotten sick and gone to

Page 161

1  the hospital, you know, I mean, it wouldn't be a
2  problem.
3          But there is apparently some
4  problem about, you know, when -- when it went to the
5  insurance company and when, you know, they would
6  start coverage. Well, there was no way that she,
7  you know, would get -- because it's up to the
8  insurance company. They have to bill you for the
9  premium, and they have to accept the person for
10 insurance.
11     Q.   Well --
12     A.   I never saw this (indicating). I
13 never -- I mean, just now, when you go, "Wow, what's
14 different about that?" I, like, went, "Holy cow."
15     Q.   What's that?
16     A.   When you pointed out that there are
17 checkmarks.
18     Q.   And what's the "holy cow" about?
19     A.   That's not Xs.
20     Q.   Uh-huh.
21     A.   I mean, hey, I never saw that.
22     Q.   In fact, your job in reviewing the form
23 was to make sure it was complete, correct?
24     A.   That was my -- ostensibly, yes, that was
25 my job.

Page 162

1      Q.   And the part of the form that you just
2  looked at, the waiver of coverage, is that complete?
3      A.   I -- I guess so. Yeah. I mean, it
4  doesn't look like she filled it in. It doesn't
5  look -- I mean, why would everywhere else she use Xs
6  and in there she would put checkmarks?
7      Q.   So it looks like somebody else filled it
8  in?
9      A.   I don't know, but it doesn't look like
10 the Xs.
11     Q.   Okay. There is a difference between the
12 markings?
13     A.   Yeah. And I don't -- I never saw it.
14     Q.   But my question is: Is this part of the
15 form completely filled out?
16     A.   Yeah, I guess.
17     Q.   Well, there is a box that says in
18 bold-face type, "Waiving all group coverage offered
19 by my employer at this time."
20     A.   Right.
21     Q.   If you were waiving that coverage,
22 wouldn't you check that box?
23     A.   Yup.
24     Q.   Or mark it in some way?
25     A.   The mark -- yes.

42 (Pages 159 to 162)

Glacier Stenographic Reporters Inc.
glaciersteno@gci.net * 907.789.9028

Page 167

1   A. No. No. No.
2   Q. It's not a subject that you and she
3   discussed; is that what you are saying?
4   A. Yeah. No. The subject that we always
5   discussed was whether or not she would get a -- like
6   a roommate, and the condition of her house because
7   she was having trouble with her landlord.
8   Q. Okay. After she got sick and came back
9   to the Bethel Group Home, did you and she ever have
10  any conversations about health insurance for her?
11  A. Yes. I mean, she came back from the
12  hospital and said that -- you know, I mean she had
13  all these bills, and she had to pay for all these
14  bills, and I knew that was probably true.
15  Q. And did she tell you that the health
16  coverage -- the group home's health plan was not
17  paying for those bills?
18  A. Well, I mean, that was -- yeah, I guess
19  that's what she -- I mean, she must have said that.
20  I mean, we had never gotten a bill for the premium
21  for her.
22  Q. And what did you tell her about this
23  issue?
24  A. "I'm sorry that you don't have
25  coverage." You know, I have -- I have MS myself.

Page 168

1   We found out what her diagnosis was. I have MS as
2   well, and I was sympathetic to her situation and all
3   of the huge medical bills that she has and -- that
4   she had, and, you know, I made the comment to her,
5   you know, "Maybe you ought to go bankrupt," and it
6   was offered as a suggestion, as a positive
7   suggestion as to how to cope with all of those --
8   the bills.
9           I mean, it wasn't -- it wasn't said
10  in a sarcastic way or anything like that. It was
11  just said as a real thing, like, you know, "You
12  don't need that kind of stress in your life." And
13  so I was aware of the fact that she -- because there
14  hadn't been any premiums, and, you know, I mean, she
15  had gone into the hospital before, you know, the
16  thing had even been mailed.
17          So I doubt seriously that, you
18  know, an insurance company is going to cover
19  something that would -- you know, that they had
20  not -- you know, I mean, they probably had not
21  received the application, and they certainly -- we
22  hadn't paid for the premium.
23  Q. Uh-huh.
24  A. So -- and she was in the -- had gone to
25  the hospital, so she was -- you know, it was kind of

Page 169

1   a bad situation. I mean, I felt really bad about
2   it. I mean, I had -- you know, I mean, I was
3   shocked to hear how bad her -- I mean, we got
4   information -- you know, we were trying to get in
5   touch with her, and, you know, we couldn't get what
6   was going on. I mean, she had been in the hospital,
7   you know, rushed out on an air flight. And like,
8   you know, what was going on?
9           And when I was -- you know, I heard
10  that it was MS, I was really surprised. So we -- we
11  were concerned about her, you know, and what her
12  health was, and what she was doing and all that. I
13  mean, and I -- and when she came out, I mean, I was
14  aware of the fact that she wasn't having -- didn't
15  have any insurance, you know. So --
16  Q. Had you ever had any conversations with
17  Starmark, your insurance carrier, about Ms. Virtue?
18  A. No. No.
19  Q. Did you make any kind of inquiry as to
20  why it was that she didn't have coverage?
21  A. Well, no, because, I mean, we had never
22  paid a premium. I mean, I -- it was -- you know, I
23  knew that she didn't have coverage, and then after
24  she came back --
25  Q. I'm trying to figure out how did you

Page 170

1   know that?
2   A. Because it was handed as a matter of
3   course to Ken Alexander, and, you know, he mailed it
4   in after she went into the hospital.
5   Q. Okay.
6   A. This cover letter is a bogus --
7   Q. Item 8A.
8   A. It is a bogus.
9   Q. What do you mean it's bogus?
10  A. It's not true. It's not -- that's --
11  it's baloney.
12  Q. It's false?
13  A. The date is -- whether he -- I don't
14  know whether he mailed it in or not. I don't
15  ever -- I was never involved in that, but I know for
16  a fact that -- I mean, he didn't even have her
17  application by that time.
18  Q. It is the same date as her application,
19  isn't it?
20  A. Yes. But she --
21  Q. So how do you know it's bogus? I mean,
22  are you saying this as a matter of fact, that this
23  document is --
24  A. Well, I don't know it as a matter of
25  fact, but I know as a matter of practice no one

44 (Pages 167 to 170)

Paul Janowiec * 12-2-2004
Virtue v. Bethel Group Home, Inc. * 4BE-04-19

Page 171

1  would have ever mailed it in to the insurance
2  company until -- on the 22nd at the earliest -- very
3  possible -- very earliest, April 22nd, would have
4  been mailed out of Bethel, and who knows when it
5  would have gotten to the insurance company. And you
6  know -- you have lived in Bethel longer than I. How
7  long does it take for -- you know, I don't know
8  where Starmark is located. They are in Lake Forest,
9  Illinois.
10            So if the mail went in -- if she
11 sat down on -- what is -- whatever the date, on the
12 22nd, April 22nd, and that would be the absolute --
13 you know, I mean, if I wasn't busy, no one was busy,
14 nothing, you know, that that would be the absolute
15 earliest possible time that that form would be
16 mailed in to the insurance company. I mean, if that
17 was the date --
18     Q.   I'm getting lost here.
19     A.   Okay.
20     Q.   Did you -- after you found out that she
21 had no health coverage, did you conduct any sort of
22 investigation to find out why she did not have
23 health coverage?
24     A.   No. No. No. Because she -- because
25 she was -- she only stayed a little bit. She only

Page 172

1  stayed a week or so.
2     Q.   Only stayed where?
3     A.   In employment at the group home. After
4  she came back from the hospital, she was in
5  pretty -- you know, she was in pretty -- you know,
6  she was kind of -- had a tough situation, and so,
7  you know, we encouraged her to work because she
8  didn't have very much -- you know, she didn't have
9  any money, and we encouraged -- you know, we made --
10 "Just be here." Okay? "Just stay here."
11            You know, I thought it was
12 important -- I mean, you have to understand. I
13 mean, I -- you know, I know what MS is all about,
14 and I was real surprised at her -- how serious the
15 situation was with her. But when she came back, she
16 was -- you know, she was week. And so, you know, we
17 encouraged her -- you know, "You don't have to do
18 anything. Just stay -- just be at work," okay? And
19 so she -- you know, and everybody was real
20 supportive of her, okay?
21     Q.   Uh-huh.
22     A.   And she then, you know, came and told me
23 that she was going -- you know, she was leaving, and
24 she was going to Ketchikan, and I -- you know, I
25 mean, I kind of -- I vaguely thought -- you know, I

Page 173

1  remember that she -- you know, she had family. I
2  think she had family in Ketchikan, so she was going
3  to go stay with her family in Ketchikan, which --
4  you know, which was fine.
5            I mean, she -- but she was -- we
6  didn't do anything because she left. I mean,
7  really, you know, it was only a couple of weeks at
8  most that she stayed before she left. And so we
9  didn't -- and I have no idea what happened, you
10 know.
11           The application, this thing, went
12 to Ken Alexander, and that was last -- that was the
13 last, you know, I had involvement with it. I -- you
14 know, I didn't look at it to begin with. I just
15 sort of scanned through it.
16     Q.   You are talking 8B, the application?
17     A.   Yeah, 8B. You know, I did not, you
18 know, look at it in any detail. I mean, it just,
19 you know --
20     Q.   But that's why it was in your office, so
21 you could look at it?
22     A.   That's -- that's -- you're -- you're
23 right. You're right, to see if it was completed,
24 you know, and it looked completed to me. I mean,
25 I -- you know, maybe that wasn't on there

Page 174

1  (indicating). Maybe those --
2     Q.   That what?
3     A.   The waiver. Maybe they weren't on
4  there.
5     Q.   The checkmarks on page 4?
6     A.   Yeah. Yeah. Because I certainly didn't
7  put them there, and I didn't tell anybody to put
8  them there.
9     Q.   Well, is it possible that Mr. Alexander
10 wrote the letter, Exhibit 8A, on the 17th of April
11 as it says, and simply kept it in his office because
12 he was waiting for the form to come back from you?
13           MR. FAYETTE:  Objection to form.
14 Go ahead and answer.
15     A.   Is it possible?
16     Q.   Yes. Is it possible that's what
17 happened?
18     A.   No. Because how would he know that she
19 was even applying for insurance? I mean, how would
20 he know -- I mean, you know -- I mean, certainly
21 other employees, unless I was working with them, you
22 know, on a project, they wouldn't know what is on my
23 desk. I mean, it wasn't -- the only person who
24 knows what's on my desk or knew what was on my desk
25 was me.

45 (Pages 171 to 174)

Paul Janowiec * 12-2-2004
Virtue v. Bethel Group Home, Inc. * 4BE-04-19

Page 175

1  Q.  Well, if she gave the form to
2  Alexander --
3  A.  She didn't. She gave it to me.
4  Q.  Do you recall that specifically?
5  A.  Yeah.
6  Q.  Okay. Did she say anything to you when
7  she gave you that form?
8  A.  I don't know. She -- you know, she
9  wanted health insurance. I mean, not that I
10 remember. I mean, you know, it's just --
11 Q.  She wanted health insurance?
12 A.  Yeah.
13 Q.  And she wasn't sick then, was she?
14 A.  No.
15 Q.  You said you have MS. When were you
16 diagnosed with MS?
17 A.  In 1990.
18 Q.  Now, MS, is this --
19 A.  I take that back. 1991. I arrived in
20 Juneau in 12-90, and it was probably just a little
21 while after that.
22 Q.  What does "MS" stand for?
23 A.  Multiple sclerosis.
24 Q.  And does this disease take various forms
25 for the individuals that have it, some more severe

Page 176

1  than others?
2  A.  Yes.
3  Q.  And how would you characterize
4  Ms. Virtue's case of MS, to the extent that you know
5  anything about it?
6  A.  I mean, I was shocked that her -- I
7  mean, when I got diagnosed, I went to Virginia
8  Mason, and the neurologist that I spoke to, you
9  know, that I saw, he -- you know, he said he saw 20
10 people that week, and three of them ended up by the
11 end of the week in wheelchairs, so I count myself
12 amongst the lucky. So, you know, I -- I was shocked
13 because she, you know, she was in bed, and, you
14 know, she couldn't eat. She wasn't eating. And, I
15 mean, she was just very incapacitated from
16 apparently which was her first relapse.
17       I mean, you know, I recall my own
18 first relapse, and, you know, it wasn't anything
19 like that. It was pretty bad. I mean, it was
20 pretty nasty. Your clinical -- your first clinical
21 thing, but she seemed -- I mean to get, you know,
22 air-vacked in seemed pretty bad. And when she came
23 back, she was very -- you know, she was weak. She
24 was -- you know, she obviously wasn't -- you know,
25 she wasn't back to her old self at all. I mean, she

Page 177

1  was pretty -- you know, pretty weak and woozy and --
2  you know.
3       I mean, she had been -- you know, I
4  had promoted her to assistant, you know, program
5  coordinator, so, you know, she was, like, supposed
6  to be in charge, when, you know, the program --
7  there were two supervisory people. One always there
8  when staff -- you know, the assistant was there,
9  like, you know, weekends and times when the program
10 coordinator couldn't be there. And, you know, I
11 mean, so I just -- you know, I told her, I said,
12 "Just be here," you know. I mean, I really didn't
13 care whether she was working or anything. Just to,
14 you know, get some money to her.
15 Q.  Back to the time when she gave you the
16 enrollment form, she gave it to you personally?
17 A.  I believe so. I believe so.
18 Q.  Did you tell her that you would,
19 quote -- that you would take care of it?
20 A.  I, you know, probably said something to
21 that effect. I don't recall exactly what I said to
22 her. I mean, she handed it in, and, you know, I
23 mean, the fact that she handed it in early, you
24 know, she -- you know, we hadn't -- she hadn't
25 completed the probationary period yet. So --

Page 178

1       MR. FAYETTE: Counsel, I don't mean
2  to interrupt, but a comfort break in the next five
3  or ten minutes would be appreciated.
4       MR. COOKE: All right.
5       MR. FAYETTE: Thanks.
6  BY MR. COOKE:
7  Q.  You mentioned that Ms. Virtue left her
8  employment with the group home shortly thereafter?
9  A.  Shortly after she came back.
10 Q.  After she came back from treatment?
11 A.  Yeah.
12 Q.  If I represented to you that the facts
13 in this case appear to show that she resigned on
14 May 17, 2002, does that seem like the right time to
15 you?
16 A.  I don't know when -- I don't know what
17 the day was that she came back from the hospital,
18 so --
19 Q.  Okay.
20 A.  I mean, it was -- you know, it wasn't
21 that long after she was -- you know, came back from
22 the hospital. I mean, I can't tell you exactly how
23 many days or, you know, weeks or whatever. I mean,
24 it was just she wasn't there very long, you know,
25 before she left.

46 (Pages 175 to 178)

Page 179

1  Q.  Okay. Would approximately the middle of
2  May seem about right?
3  A.  Yeah. I mean, I don't -- when did
4  she -- my question -- I asked you when did she go
5  into the hospital?
6  Q.  I don't have her medical records with
7  me.
8  A.  I mean, she was -- she was in the
9  hospital for a while. I mean, it seemed like, you
10 know, for several weeks.
11 Q.  Now, you told her that she could -- she
12 should file bankruptcy? What were your exact words?
13 A.  Well, she was like -- I mean, you
14 know -- you know, I mean, she must have said that
15 she had all these medical bills. And, you know, we
16 were talking about what to do about it, and, you
17 know, I don't have -- there is no health insurance,
18 and, you know, I mean, like I was trying to get --
19 you know, get money to her by, you know, having her
20 stay and work and, you know, we were trying to -- we
21 were supportive, and, you know, I myself was very
22 supportive of her situation. I have the same exact
23 situation that she does.
24 Q.  Yes. I understand. My question was
25 what did you tell her about this bankruptcy

Page 180

1  situation?
2  A.  Well, that, you know -- that maybe
3  bankruptcy was a way of, you know, dealing with all
4  of, you know, the bills that you have, you know,
5  that are stacked up, is that -- you know, I mean, if
6  you don't have the money to pay them, and, you
7  know -- I mean, you don't need stress, and you don't
8  need, you know, to have a bunch of bills around.
9       And so, you know, one of the ways
10 that I -- you know, I mean, I may have said to her
11 that I had been bankrupt. I had been bankrupt
12 before, and that, you know, that's a way of -- I
13 mean, when you have got a lot -- you know, to cope.
14 And that, you know, given her circumstances, that's
15 probably -- might be the best way to cope.
16 Q.  Of course, you are not a lawyer. You
17 can't give her legal advice.
18 A.  No. No. No.
19 Q.  You say you have personal experience
20 with bankruptcy?
21 A.  Yeah. Yeah. Yeah.
22 Q.  And when was -- did you file for
23 bankruptcy?
24 A.  Yeah.
25 Q.  When was that?

Page 181

1  A.  Well, the first time -- I have been
2  bankrupt twice. The first time was right after I --
3  I think it was probably right after I got out of
4  graduate school the first time, so that was probably
5  '70 something. '75 was when I got my first graduate
6  degree.
7  Q.  What kind of debts did you discharge at
8  that time?
9  A.  Well, at that time you could discharge,
10 you know, student loans. So I discharged a small --
11 you know, some personal debt, you know, consumer
12 debt, and student loans.
13 Q.  What was the amount of the debt that you
14 discharged at that time?
15 A.  I have no idea. It was not -- I mean,
16 you know, just student loans that I had, you know,
17 piled up probably from -- some at the end of
18 undergraduate and some at the end of graduate
19 school.
20 Q.  So you borrowed money to attend college
21 in graduate school?
22 A.  Uh-huh.
23 Q.  And then when you were done with that,
24 you went through bankruptcy and didn't pay back
25 those loans?

Page 182

1  A.  That wasn't the plan, but, I mean, I
2  didn't, you know, have a job, and I was, you know,
3  working at, you know, a job that -- it wasn't paying
4  very much. I didn't have, you know, a good job or
5  anything, and so --
6  Q.  In what location -- what court location
7  did you file that bankruptcy?
8  A.  Probably Los Angeles.
9  Q.  Do you happen to know the case number?
10 A.  You are talking about something that
11 happened almost -- more than 30 years ago. No.
12 Q.  Okay. You said there was a second time
13 that you filed bankruptcy?
14 A.  There was a second bankruptcy.
15 Q.  When and where was that?
16 A.  That was in about '95, maybe, here in
17 Juneau.
18 Q.  Okay.
19 A.  I was, you know -- while I was trying --
20 maybe it was -- yeah, it was while I was trying to
21 set up private practice that that was -- put a lot
22 of financial strain on us, and so, you know -- and I
23 wasn't -- you know, there wasn't a big source of
24 income, and there were bills that had to be paid,
25 and, you know, that -- to me there was quite a debt,

47 (Pages 179 to 182)

Paul Janowiec * 12-2-2004
Virtue v. Bethel Group Home, Inc. * 4BE-04-19

Page 183

1  and so, you know, we went bankrupt on that debt.
2      Q.   When you say "we," is that --
3      A.   My wife and I.
4      Q.   Both of you went through personal
5  bankruptcy?
6      A.   While we were married.
7      Q.   Was that, what, Chapter --
8      A.   I have been married, you know, 30 years,
9  so, yeah, we went through --
10     Q.   Chapter 13?
11     A.   I guess. I don't know.
12     Q.   And that was filed here with the federal
13 court here in Juneau?
14     A.   I forget you're not -- you don't live in
15 Juneau. There is a guy that does all the legal
16 stuff for bankruptcy. Weidner or something like
17 that, W-E-I-D-N-E-R. He's the attorney in town
18 that, you know -- he even has a thing in the
19 classifieds. So, I mean, that's -- that's a remedy
20 that is available when you are up against a wall.
21     Q.   What was the amount of the debt that you
22 discharged?
23     A.   $70,000. About $70,000.
24     Q.   And when was your discharge final?
25     A.   I don't know exactly. I mean, it was --

Page 184

1  you know, the filing was, you know, around I'd say
2  when I left, right after I left CBJ. I was --
3      Q.   Now is "CBJ" the City and Borough of
4  Juneau?
5      A.   Yes. And I was trying to, you know,
6  start a private practice, and, you know, it just
7  wasn't working.
8      Q.   Did you discharge medical bills --
9      A.   No. No.
10     Q.   -- in the Juneau bankruptcy?
11     A.   Not that I know of. I don't think so.
12 It was mostly consumer debt.
13     Q.   Did Ms. Virtue have any reaction to your
14 suggestion that she file personal bankruptcy?
15     A.   Not that I remember. Not that I
16 remember. I mean, it wasn't offered to her as a bad
17 thing. It wasn't said to her in a negative way or
18 sarcastic way or anything like that. It was offered
19 to her as a support.
20     Q.   But she didn't ask you any questions
21 about it, I presume?
22     A.   No. No. No. I don't know whether I
23 offered that I had been bankrupt before or not. You
24 know, I might have. I don't remember. I just
25 remember that I had, you know, said something about

Page 185

1  the bankruptcy.
2           MR. FAYETTE: Counsel, could we --
3           MR. COOKE: Oh, you want a break?
4  Sure. Yes. Let's take a break.
5           Carolyn, I'm going to call you on
6  my cell phone in a few minutes. We will be off
7  record for, what, ten minutes or so?
8           MR. FAYETTE: Not even. Five is
9  fine.
10          THE REPORTER: Off the record.
11          (Off record)
12          THE REPORTER: We're back on the
13 record. It's 2:56 p.m. You may proceed.
14          MR. COOKE: Thank you.
15 BY MR. COOKE:
16     Q.   Mr. Janowiec, I hope this isn't just
17 repetition -- well, strike that. If I say
18 something, he's going to object, so I don't want to
19 give him any clues. Let me start here.
20          When you learned that Ms. Virtue
21 was sick, and that this enrollment form was still on
22 your desk, what did you do to see if she could be
23 placed under the Bethel Group Home's health coverage
24 plan?
25     A.   Nothing. I mean, I assumed that she

Page 186

1  had -- was already sick. I mean, I didn't -- I
2  hadn't, you know, had any contact with the health
3  insurance people. I mean, the only, you know,
4  contact that I had had was through our broker, and
5  they, you know, put forward saying these are people
6  that could be -- you know, could be underwriters,
7  and so my conversations with them had to do with
8  talking to the employees and talking to the broker.
9      Q.   Okay. So did you or -- well, did you
10 have any contact with Starmark to see whether
11 Ms. Virtue could be listed under your policy?
12     A.   No. No.
13     Q.   Did you ask anyone else at the group
14 home to investigate that?
15     A.   No. No.
16     Q.   You said that you had never gotten a
17 premium for her or hadn't paid a check?
18     A.   No. No.
19     Q.   There was some testimony you gave like
20 that. What was that testimony?
21     A.   Whenever somebody enrolled in insurance,
22 health insurance, you know, they would get added to
23 the bill. I mean, we would get a bill, an invoice
24 from the insurance companies that would list all of
25 the names of the people that were getting -- you

48 (Pages 183 to 186)

Paul Janowiec * 12-2-2004
Virtue v. Bethel Group Home, Inc. * 4BE-04-19

Page 187

1   know, were getting insurance. And we would -- you
2   know, I'd write -- I mean, the business manager, you
3   know, would write a bill -- or write a check.
4       Q.   A check?
5       A.   You know, and attach the check to the
6   invoice, you know, and I was one of the signatories,
7   and it would be signed by myself and by the board
8   member. So -- and I never saw -- I mean, it never
9   came to my attention that -- I mean, that her name
10  appeared on -- I mean, I'm sure there was the next
11  bill when, you know -- and she was -- we never paid
12  any premium on her insurance. She was only -- I
13  mean, she came back from the hospital, and she was
14  only there for a short while.
15      Q.   Yes, but I was curious about that
16  testimony because those bills, those invoices
17  wouldn't come to you anyway, would they?
18      A.   No. No.
19      Q.   They'd go to the business manager?
20      A.   That's correct.
21      Q.   That was Alexander?
22      A.   Right.
23      Q.   Okay. So did you ever do any research
24  to look at all those invoices and find out if she
25  ever was listed --

Page 188

1       A.   No.
2       Q.   -- under your policy?
3       A.   No. No. I mean, she -- she was gone,
4   and if -- if she had been enrolled, I mean, you
5   know, I mean Alexander -- I told him to send it in,
6   and if he did that right away, okay, I mean, her
7   name would have appeared on an invoice.
8            And I -- and I -- you know, I mean,
9   I mostly just -- I sign the check. I mean, if --
10  you know, I mean, when you have a stack of checks,
11  you know, a huge stack of checks, you know, and you
12  got to sign them all, you know, it's just like
13  looking at the forms. I mean, you know, if you want
14  to take three hours to do it, you know, you are
15  going to read every invoice. You know, what needs
16  to happen is you got to sign the checks. Okay?
17      Q.   Well, yeah --
18      A.   So -- and I never saw whether or not she
19  was -- had actually been enrolled or not. I don't
20  think that she did because certainly by the time
21  that she was -- you know, she was only -- she was
22  gone, you know, in a brief period of time. I never
23  knew that, you know -- I mean, no one ever said to
24  me that she was withdrawn from the insurance policy
25  or anything like that. I knew that she didn't have

Page 189

1   insurance.
2       Q.   But my question was: Did you or anyone
3   at the group home make any effort to see if she
4   could be placed on your --
5       A.   No. No.
6       Q.   -- insurance policy?
7       A.   No. No.
8       Q.   You just assumed that that could not be
9   done; is that correct?
10      A.   That's correct. Because she -- she was
11  already sick then.
12      Q.   Right. So then I'm trying to -- in
13  terms of this lawsuit and some of the arguments that
14  are being made here, I'm trying to figure out why
15  was it that she did not have health coverage at the
16  time that she got sick, after April 21st, 2002?
17      A.   Well, okay. Say --
18      Q.   What was the reason? Why didn't she
19  have coverage?
20      A.   When did she go in the hospital?
21      Q.   Let's assume she went in after April 21.
22  Okay?
23      A.   But not very long after that.
24      Q.   I don't know. I'm asking you a
25  question.

Page 190

1       A.   Right. Right.
2       Q.   And the question is: What went wrong
3   here? Why did she not have health care coverage --
4       A.   Nothing --
5       Q.   -- under the Bethel Group Home health
6   plan?
7            MR. FAYETTE: I'm going to object
8   to the form. Go ahead and answer.
9       A.   Okay. Nothing went wrong. Nothing went
10  wrong. It was unfortunate that she was in the
11  hospital. I mean, if -- if it had been that she
12  went in the hospital two months later, then it would
13  have been -- you know, the form probably would have
14  been received by the health insurance people, and we
15  probably would have paid the premiums, and
16  everything would have been hunky-dory.
17           What happened was that she got sick
18  before the thing was probably even mailed to the
19  health insurance, and certainly before, you know,
20  any premiums were paid. And no insurance company is
21  going to insure her for, you know, multiple
22  sclerosis or for anything that had to do with
23  multiple sclerosis.
24      Q.   Is that your job to determine whether
25  she got sick after the coverage went into effect or

49 (Pages 187 to 190)

Paul Janowiec * 12-2-2004
Virtue v. Bethel Group Home, Inc. * 4BE-04-19

Page 191

1 before?
2   MR. FAYETTE: I'll pose an
3 objection. I'm not sure he finished his last
4 answer. The last clause was, "No insurance company
5 is going to insure her for" -- and I didn't know if
6 the witness had finished the answer.
7   Q.  Oh, I'm sorry if you didn't finish your
8 answer.
9   A.  I mean, the judgment -- you know, I
10 mean, the reason why we didn't beat the bushes then
11 was because she was sick, and she had a preexisting
12 condition. And you're -- you know, I mean, what was
13 happening then was, you know, no insurance company
14 that I know of -- I mean, and I'll tell you what the
15 previous history was there is the previous business
16 manager, when -- as I was telling you, there was a
17 switch in insurance. The previous business manager,
18 when we switched from this -- from this broker to
19 this broker, she went around, unbeknownst to me, and
20 unsolicited -- nobody asked her -- and she told the
21 insurance company, the underwriters what she
22 thought -- she thought -- everyone's preexisting
23 condition was, though they didn't ask her. She
24 didn't know --
25   Q.  But this has nothing to do with

Page 192

1 Ms. Virtue, does it?
2   A.  No. No. No. Right. So I'm very
3 sensitive, and, you know, the fact that I have MS, I
4 mean, is -- you know, you are real sensitive to
5 whether or not, you know, you are going to be able
6 to get insurance.
7       And so I don't think that insurance
8 companies are in the business of paying medical
9 costs for illnesses and accidents that occur before
10 the person is insured. So -- and, I mean, that's
11 essentially what happened here.
12   Q.  Was Ms. Virtue ever covered as a group
13 home employee under the group home's health
14 insurance plan?
15   A.  I don't think so. I don't know whether
16 Alexander sent the thing in.
17   Q.  Okay. Did Starmark, the insurance
18 company --
19   A.  Yes.
20   Q.  -- ever decline to pay Ms. Virtue's
21 medical bills?
22   A.  I don't know. Apparently they didn't.
23 I don't know anything about it. I don't know.
24   Q.  Well, if --
25   A.  How would I know if they paid the bills?

Page 193

1   Q.  So that information never came to you?
2   A.  No.
3   Q.  But you never checked with Starmark to
4 see whether she could be enrolled under that plan,
5 right?
6   A.  No. I never checked with them.
7   Q.  And nobody else at the group home ever
8 checked to see whether she could be covered?
9   A.  I don't know. I mean, I have no idea
10 what -- what, you know, Alexander was doing. I
11 mean, I had no idea.
12   Q.  Okay.
13   A.  I mean, I had given him the form and
14 said, "Send this to the insurance company." I mean,
15 I didn't go back and say, you know, "Did you do
16 that?" I didn't do that.
17   Q.  Did anybody ever tell you that the
18 reason why her medical bills were not being paid was
19 because the waiver of coverage box was checked?
20   A.  No. I didn't hear that until -- and I
21 never -- I never -- I didn't ever hear that directly
22 from anybody. I only heard that as a matter of, you
23 know, sort of -- well, because there had been some
24 sort of a -- you know, she had gone to a public
25 legal services in Ketchikan, and, you know, was, you

Page 194

1 know, threatening to sue or whatever kind of thing.
2       And so there had been -- legal
3 services from Ketchikan had, you know, contacted us,
4 and, you know, I don't know if it was a letter or
5 what. I think it was -- might have been a letter.
6 And so, you know, it was all new -- I didn't know
7 anything about it, and so I -- you know, I mean, I
8 told someone to go -- you know, gave her -- gave --
9 you know, that probably, you know, I don't know if
10 it was Charlene or when -- who it was, you know, and
11 Myron Angstman ended up with her personnel file.
12       And I didn't talk to him directly,
13 but the information I got back was that -- I mean, I
14 don't know what she's talking about. I mean, she
15 checked she didn't want health insurance. That's --
16 and it was like, okay. I mean, I never saw that
17 anywhere. I never saw a form that said that or
18 anything, and all of a sudden I'm hearing from
19 Angstman's office, "Well, okay. She checked the
20 box. What is she talking about?"
21   Q.  As far as you know, the checkmark in the
22 waiver of coverage form is not the reason that she
23 did not have health coverage?
24       MR. FAYETTE: Object to form.
25 Answer if you can.

50 (Pages 191 to 194)

Glacier Stenographic Reporters Inc.
glaciersteno@gci.net * 907.789.9028

Paul Janowiec * 12-2-2004
Virtue v. Bethel Group Home, Inc. * 4BE-04-19

Page 195

1  A.  As far as I know?
2  Q.  To the best of your knowledge.
3  A.  Well, it is. It was -- I mean, from
4  what I heard. I didn't hear it from Angstman, and
5  someone who got information from Angstman said --
6  well, in response to, apparently, the inquiry from
7  legal services in Ketchikan. I mean, this woman is
8  saying, you know -- and so she filled out this form
9  and said she didn't want health insurance.
10      And I go, "Well, okay. So what in
11 the hell is she talking about?" I didn't know. I
12 had never -- I mean, I handed this thing to
13 Alexander. I have never seen this letter or
14 anything.
15 Q.  All right. You are the client
16 representative for the Bethel Group Home in this
17 case, are you not?
18 A.  Client.
19 Q.  Client?
20 A.  Not employee.
21 Q.  Client representative for the Bethel
22 Group Home in this case?
23 A.  Right.
24 Q.  Are you telling me that the reason she
25 didn't have health coverage is because this waiver

Page 196

1  coverage form was checked? Is that the defense?
2      MR. FAYETTE: Object to form. Go
3  ahead.
4  A.  I -- I heard through the grapevine,
5  because I didn't talk to Myron Angstman -- that
6  she --
7  Q.  I'm sorry for interrupting, but it
8  sounds like what you said before. I'm asking about
9  this case. I mean, Myron Angstman isn't involved in
10 this case.
11 A.  He was involved with this form. He
12 apparently reviewed this form and saw -- I mean,
13 apparently so, because -- I didn't talk to him
14 directly. But I heard -- you know, I mean, someone
15 must have -- from Bethel Group Home must have talked
16 to Myron and got the information that she had
17 declined coverage.
18 Q.  The whole purpose in this deposition is
19 to ask you about things that are within your
20 personal knowledge. Do you have any personal
21 knowledge of what you just said?
22 A.  What do you mean "personal knowledge"?
23 Q.  Well, I mean, you are saying you think
24 that somebody from the group home might have talked
25 to Myron Angstman?

Page 197

1  A.  Listen. Listen. I had 25 employees,
2  okay? I had -- at the group home there were, at any
3  give time, ten kids. We were, you know, I mean,
4  operating the receiving home, and we had, you know,
5  kids coming and going from the receiving home. And
6  so, you know, I don't have a lot of personal
7  knowledge about a lot of stuff.
8  Q.  Okay.
9  A.  I mean, people give you -- you know, you
10 are trying to stay informed about what is going on,
11 okay? I mean --
12 Q.  Okay. Let me shift gears here for a
13 minute.
14 A.  -- you know ...
15 Q.  Of those 25 employees at the Bethel
16 Group Home, how many of them were enrolled in your
17 health insurance plan for employees?
18 A.  That worked at the group home?
19 Q.  Yes.
20 A.  How many? There were probably eight or
21 nine employees there. Probably five, maybe four.
22 Q.  At the time Ms. Virtue was working
23 there?
24 A.  You know, I can't tell you who were all
25 the employees at the time that she was working

Page 198

1  there, but, you know, I wasn't. I don't think that
2  Alan Glore --
3  Q.  Who?
4  A.  Allen Glore. He was an employee there.
5  Certainly --
6  Q.  Do you know the reason that he didn't
7  have health coverage?
8  A.  Yes, because his wife worked at the
9  university.
10 Q.  Okay.
11 A.  Jody Sleppy had been turned down.
12 Q.  What was Glore's position? Was he
13 the --
14 A.  He was a youth counselor.
15 Q.  Okay. Jody Sleppy had been turned down?
16 A.  Uh-huh.
17 Q.  Because --
18 A.  He didn't fill out the form correctly.
19 Q.  Did he subsequently fill it out
20 correctly?
21 A.  No, he quit.
22 Q.  Okay.
23 A.  He quit because he didn't get health
24 insurance, and he needed health insurance. And, you
25 know, we were, you know, switching health insurance

51 (Pages 195 to 198)

Paul Janowiec * 12-2-2004
Virtue v. Bethel Group Home, Inc. * 4BE-04-19

Page 199

1  and trying to get him enrolled in the new place and
2  all that.
3      Q.   What about Alexander? He worked there.
4  Did he have health coverage?
5      A.   I don't know. That's a good question.
6      Q.   What about Gracie Cleek?
7      A.   She had health insurance because I was
8  involved with that.
9      Q.   What about Robin Lone?
10     A.   Who?
11     Q.   Robin Lone. That's the name I have. It
12 came out of a different document.
13     A.   I don't know if there was ever a Robin
14 Lone that there. There may have been. I don't
15 know. I don't think so.
16     Q.   Robin Lone Wolf?
17     A.   Not Robin. There was a guy that was --
18 we hired, a substance abuse guy. That's not his
19 name, though, but it's close.
20     Q.   How about Charity Condit?
21     A.   Charity Condit? Yeah, I believe she had
22 insurance, too. But she wasn't working at the same
23 time that Alexander was there.
24     Q.   Is there anybody else who was working
25 there at the time that Ms. Virtue was whose name I

Page 200

1  did not mention?
2      A.   There was a kid that we had that worked
3  full-time at the bank was there. But he had
4  insurance through the bank. I mean, I don't have --
5  I mean, I was there for a period of five years. I
6  mean, how long people stayed and who was employed --
7  you know, it is hard to know when people matched --
8  you know, when they were employed.
9      Q.   Sure.
10     A.   I mean, Rob Lannoye was there. I mean,
11 I don't know if that was like -- I think that was --
12 whether that was the first time he was there or the
13 second time he was there, because he left employment
14 and then came back.
15     Q.   When he worked there did he have health
16 insurance?
17     A.   You know, I mean, I think, like I was
18 saying before, that he was a guy that, you know,
19 refused health insurance initially, and I don't
20 know. I think that he, you know, probably didn't
21 have health insurance until he came back the second
22 time.
23     Q.   Okay. But it is your testimony, then,
24 that if Bethel Group Home employees were not covered
25 under your health insurance plan, it was because

Page 201

1  they had health insurance coverage elsewhere?
2      A.   Elsewhere.
3      Q.   As you did?
4      A.   Or -- and I was aware -- you know, I
5  mean, I'm actually not sure how much I knew at the
6  time. I mean, I knew that Lannoye apparently
7  refused the health insurance. But, you know,
8  generally speaking, I mean, Jody Sleppy was, you
9  know, a case exception. I mean, he was turned down,
10 and we -- you know, then as a result -- because he
11 had been turned down because he didn't fill out the
12 form correctly, he then -- you know, we tried to,
13 you know, make them -- and reiterate to the
14 employees they had to fill out the form more
15 correctly. He was turned down a second time, too,
16 because he was too heavy.
17     Q.   You know, when --
18     A.   I mean, it sounds like I wasn't paying
19 attention to what was going on. It wasn't that I
20 wasn't paying attention. There was so much going
21 on, you know.
22     Q.   And then I think this is my last subject
23 here. How did it come to your attention that
24 Melissa Virtue's medical bills were not being paid
25 by Starmark, your health coverage company?

Page 202

1      A.   Well, she -- when she came back, I mean,
2  she made a, you know, point out of it. She had all
3  this debt. And --
4      Q.   She brought -- in other words, you
5  learned about it from her?
6      A.   Right. Right.
7      Q.   And --
8      A.   And I would have known. I mean, the
9  fact that we had never paid any premiums, you know,
10 and I wasn't aware of the fact there was -- that the
11 insurance company we had had come back with anything
12 saying that she was insured, you know. Because --
13 and I -- I would -- I mean, it wasn't like you are
14 tracking things all the time. You only become aware
15 when there is something you are supposed to do.
16     Q.   What were her words to you, you know,
17 asking that question?
18     A.   I don't remember exactly. She was
19 obviously -- she was very upset by the fact that she
20 had a huge debt, you know, that she had gotten --
21 you know, having gone -- being in the hospital.
22          She was also -- she was very weak
23 at the time. I mean, she was, you know, struggling.
24 That's -- and I remember that. And so I was, you
25 know, trying to be, you know, supportive of her, and

Paul Janowiec * 12-2-2004
Virtue v. Bethel Group Home, Inc. * 4BE-04-19

Page 203

1  so, you know, about the -- you know, this debt. I
2  knew that she didn't have insurance.
3      Q.   Okay.  Did you have only one
4  conversation with her about the lack of insurance,
5  or were there multiple conversations?
6      A.   No.  There was only -- there was one
7  conversation and, you know, there might have been --
8  you know, I mean, the second time when she told me
9  that she was quitting, you know, we were sort of
10 like standing in the staff office, and, you know,
11 she was going back to Ketchikan.
12          So, I mean, there was only really
13 two conversations with her that I, you know, have
14 any kind of recollection of.
15     Q.   During which conversation did you
16 suggest that she could file bankruptcy?
17     A.   The first conversation.  I mean, I don't
18 think I -- you know, it wasn't like she was going
19 back to Ketchikan, and I said, "Well, you ought
20 to" -- I mean, I think that when she came back in
21 the beginning she was talking about debt.
22     Q.   And you said she was upset?
23     A.   Well, yeah.  She was -- I mean, she
24 was --
25     Q.   How do you know she was upset?

Page 204

1      A.   Well, I mean, because she probably said
2  she was upset.  I mean, she was, you know, obviously
3  distressed about -- you know, I mean, she had come
4  back from the hospital and she was sick.  And, you
5  know, everyone there was concerned and upset that,
6  you know, she had gotten sick, and, you know,
7  everyone was trying to be helpful.  And so, I mean,
8  she was obviously -- you know, she was upset about
9  the bills that she had gotten.
10     Q.   Was she angry?
11     A.   I don't remember her being angry at all.
12     Q.   Did she cry?
13     A.   I don't remember.  I don't think so.  I
14 mean, she was not the kind of -- I mean, she was a
15 former cop.  I don't think that she would do that.
16     Q.   Okay.  And did you --
17     A.   I mean, she had an edge to her, too.
18     Q.   Did you give her any reason as to why
19 she was not covered?
20     A.   No.  No.  No.
21     Q.   And --
22     A.   I mean, she -- you have to -- I mean,
23 she was coming back from the hospital, and from what
24 had -- it looked like in the beginning had been
25 really -- I mean, it was a serious matter.  I mean,

Page 205

1  we -- at first we didn't know -- we couldn't get
2  information, and it sounded like she was wasn't --
3  she was almost vegetative in the beginning.  And,
4  like, we were, like, really kind of worried and
5  scared.  I mean, you know -- and Glore was trying to
6  get conversation, you know, trying to find out --
7  calling the hospital and get information.
8           And so, you know, I mean, everybody
9  was happy that she was back and that she was okay.
10 We didn't anticipate that she was going to leave.  I
11 mean, that was -- you know, that came -- it wasn't
12 very long -- after a while, but, I mean, everyone
13 was just happy that she was back.
14     Q.   Did you tell her that you would make an
15 effort to find out whether she could be covered
16 under the health plan?
17     A.   Not that I -- no, I don't think so.
18     Q.   Why didn't you do that?
19     A.   I don't know.  I mean, I didn't -- you
20 know, didn't do it.  I mean, I -- because, you know,
21 I mean, I didn't know that she wasn't going to be
22 covered because of -- you know, other than the fact
23 that we hadn't gotten anything -- the premiums back,
24 or we hadn't -- I mean, I was not aware of the fact
25 that -- I mean, I don't know what Alexander did with

Page 206

1  the application.  I mean, it's presumably -- did it
2  go to -- did it go to Starmark?
3      Q.   Are you asking me?
4      A.   Yeah.
5           MR. FAYETTE:  He's not allowed to
6  answer your questions.
7      A.   I mean, I have no idea.  I -- you know,
8  I mean, I assumed that it did, but we didn't get
9  any -- you know, I didn't know that.  I mean, we
10 would get under -- if -- if she had had coverage, we
11 would have gotten a bill.  Plus -- plus there would
12 be -- they send in the mail, you know, to the
13 employee, they send a big -- you know, big envelope
14 with, you know, a Manila folder that has got --
15 "This is your policy and this is your card," and
16 blah, blah, blah.
17          They send that to the employer, and
18 then the employer gives that to the employee.  We
19 had never gotten anything like that on her.  I mean,
20 there was no way.
21     Q.   Well, you didn't think it was important
22 enough to call Starmark to find out what happened?
23     A.   Well, their next step -- I didn't know
24 that they -- I mean, it was sent to them after she
25 got into the -- into the hospital, okay?

53 (Pages 203 to 206)

Paul Janowiec * 12-2-2004
Virtue v. Bethel Group Home, Inc. * 4BE-04-19

Page 207

1  And so, I mean, in my mind, you
2  know, this was an after-the-fact kind of thing. I
3  mean, assuming that they, you know, had -- you know,
4  Alexander had sent it in, that there hadn't been a
5  policy issued because we hadn't paid premiums, and
6  we hadn't got any, you know, mail that she had her
7  insurance, you know, the envelope and the card.
8  So those signals to me had not
9  happened, the signal being that you sign the check,
10  and the other one, that you get the enrollment
11  information back. That had not happened. So I was
12  aware of the fact that she had not -- you know, that
13  she didn't have any insurance.
14  I had no idea why. I mean, they
15  should have -- I mean, assuming that she was -- that
16  everything was sent in to them correctly, then they
17  still should have issued a policy that -- you know,
18  it's just -- I mean, they probably wouldn't have
19  paid for the stuff that had happened, you know,
20  before the policy went into effect, but they, you
21  know, still would have issued insurance to her,
22  unless they turned her down completely, which I
23  don't think they would have. They would have
24  probably excluded, you know, treatment for MS.
25      Q.   You are saying a lot of opinions here.

Page 208

1  What do you base those opinions on? Are you -- do
2  you have some expertise in the field of employee
3  benefit insurance?
4      A.   I had been -- I had experience with what
5  the underwriters had done before. I mean, I told
6  you about Jody Sleppy. They -- I mean, they had
7  turned him down because the form wasn't filled out
8  correctly. And then they said he couldn't apply for
9  any more insurance. They didn't say, "Here is the
10  form back, and you can fill in the blank" that he
11  left unfilled. They said, "I'm sorry. He doesn't
12  get any insurance."
13  So then we tried to enroll him in
14  other insurance, and they said, "No, you can't have
15  insurance because you are too fat."
16      Q.   But in this case involving Ms. Virtue,
17  you are the one who decided that she wouldn't be
18  able to get coverage --
19      A.   No.
20      Q.   -- for her illness; isn't that what you
21  are saying?
22      A.   Well, no. No. I'm not decide -- I
23  didn't decide that.
24      Q.   But you never submitted it to Starmark
25  for them to decide?

Page 209

1      A.   I wouldn't have anyway. It would have
2  been the business manager who would have sent the
3  application in. And then -- then the only -- the
4  marker that I would have known about would be that
5  there would be an invoice and bill to sign -- or a
6  check to sign.
7      Q.   So you find out you have an employee and
8  she's sick --
9      A.   Uh-huh.
10      Q.   -- and you sent -- and the form was
11  still on your desk when you knew she was sick?
12      A.   Uh-huh.
13      Q.   And she comes back, and she's got huge
14  medical bills, and you do nothing to find out if the
15  insurance company will pay the bills for your
16  employee?
17      A.   No, I didn't. And I wouldn't -- I mean,
18  as an employer, you know, we felt that -- I felt
19  that we had done our, you know, duty. We sent the
20  application in. That's what I understood. And so,
21  you know, we just hadn't heard anything back. I
22  hadn't gotten, you know, the bills and all that.
23  I mean, we had done what we were
24  supposed to do, okay? That's all we could -- we
25  would do. It's up to the -- it is between the

Page 210

1  insurance company and the employee. And they, you
2  know, I mean, that's -- we wouldn't necessarily, you
3  know, intervene with the insurance company. I mean,
4  I don't tell them how to do their business.
5  That's -- that's what you're asking
6  me. You say, "Well, why didn't you do this?" Well,
7  the reason is because we didn't -- we didn't
8  intervene in what the brokers or underwriters said.
9  The same -- we tried -- we did with Sleppy. They
10  sent back to him -- they communicated to him that
11  he -- you know, they weren't going to give him
12  insurance because he hadn't filled out the form
13  correctly.
14  And so we -- as a result, we
15  went -- you know, we tried to get different
16  insurance for him. We tried to get, like, private
17  insurance, you know, and so --
18      Q.   When --
19      A.   -- but you are saying why didn't I --
20      Q.   When would this have been with Sleppy?
21      A.   It was earlier. It was, you know,
22  probably in maybe the late fall or early winter.
23      Q.   Of 2001, the previous year?
24      A.   Yeah, around in there. Maybe the end of
25  2001, beginning of 2002, around in there.

54 (Pages 207 to 210)

Page 231

1    A.   That's not when she was hired, though,
2  necessarily.
3    Q.   And so my question of you is: Do you
4  know if there are other records in this case that
5  have a different date styled as a date of hire?
6    A.   There wouldn't be.
7    Q.   Do you know?
8    A.   No.
9    Q.   All right.
10   A.   Her application, if there is an
11 employment application, might show -- it might show
12 the date that she filled out the application.
13   Q.   Okay. Now, returning to the chronology
14 of her hospitalization, do you believe you got
15 Ms. Virtue's application sometime in April of 2002?
16   A.   Yes.
17   Q.   As opposed to May?
18   A.   Yes.
19   Q.   And do you believe you got her
20 application after the 17th?
21   A.   Oh, yeah. Well, no, I think that she
22 probably turned it in around then.
23        MR. COOKE: Excuse me. You are
24 talking about what application?
25        MR. FAYETTE: Excuse me. I should

Page 232

1  have -- the application for insurance.
2        MR. COOKE: The enrollment form.
3        MR. FAYETTE: Right.
4  BY MR. FAYETTE:
5    Q.   This Employee Enrollment Form,
6  Exhibit 8B -- you reviewed some document that was
7  the same Starmark form, right?
8    A.   Yes.
9    Q.   And you believe that was in -- when?
10   A.   I mean, you know, I don't have any
11 reason to believe that she turned it in on anything
12 other than the 17th, though she may have signed it
13 and turned it in later. I don't think that she
14 would turn it in -- that she would sign a date that
15 was, you know, different than what the date was she
16 turned it in.
17   Q.   Okay.
18   A.   So -- but I don't know that for a fact,
19 what date exactly.
20   Q.   So the 17th, 18th of April is -- you
21 have no better estimate?
22   A.   No. I don't have a --
23   Q.   Okay.
24   A.   I mean, I think that she probably turned
25 it in around the time she filled it out.

Page 233

1    Q.   Okay. And you said several times today
2  that one ballpark, one time frame of reference would
3  be the date that she went, quote, unquote, to the
4  hospital.
5    A.   Right. Which I don't know what date
6  that was.
7    Q.   I want you to -- well, all right. I
8  want to go back to your actions, though, all right?
9  You said that the application wouldn't have been
10 processed until her 90 days had passed?
11   A.   That's correct.
12   Q.   Assuming January 21st is accurate --
13   A.   Uh-huh.
14   Q.   -- that means, then, that the earliest
15 you would have processed -- you would have directed
16 the processing of the application would have been
17 April 21st?
18   A.   Well, that would be -- that would be
19 April 22nd, because that's the day -- that would be
20 the day after she -- you know, 90 days. If she was
21 hired on the 21st, then 90 days would be April 21st,
22 and so on the 22nd would be -- you know, at the very
23 earliest possible thing would be -- you know, I
24 mean, I don't know what day of the week that is, or
25 you know, whatever. But that that, you know, is the

Page 234

1  earliest possible time that it would have been --
2  even if, you know, you mailed it in, you know, that
3  would have hit the mailbox, you know, in Bethel on
4  the 22nd. You know, like we are running around
5  doing that -- I don't think that that --
6    Q.   Have you ever sat down with a 2002
7  calendar and added 90 days to January 21st?
8    A.   No.
9    Q.   All right. And do you know what day she
10 was airlifted out of Bethel?
11   A.   No.
12   Q.   All right.
13       MR. FAYETTE: Those are my
14 questions.
15   A.   I mean it was --
16 BY MR. FAYETTE:
17   Q.   Those are my questions.
18   A.   Right.
19   Q.   Unless you need to --
20   A.   No. No.
21   Q.   Unless you need --
22   A.   No.
23   Q.   You said no? Okay.
24       MR. FAYETTE: Those are my
25 questions.

Paul Janowiec * 12-2-2004
Virtue v. Bethel Group Home, Inc. * 4BE-04-19

Page 239

1  of applications that we were sending to the -- to
2  the insurance company. I mean, I kind of doubt we
3  were, but --
4      Q.  Okay.
5      A.  -- if there was such a record, it would
6  be probably in either of those two places. But I
7  don't think we were.
8      Q.  As to such records, who would have had
9  custody of them from 2002 until October of 2004?
10 Who had custody of them?
11     A.  Well, until February 29th, 2004, they
12 were -- you know, those records were available, and
13 they were in files in the group home -- at various
14 times in my office, or in the business manager's
15 office. They changed, and we went and located them
16 over at the receiving home. And up until
17 February 29th, those files and records -- anybody,
18 you know, could have gotten to them. I mean, there
19 was -- they were not, you know, particularly secure.
20 Anybody after that -- I mean, they were --
21     Q.  Are you saying we can't rely on the
22 Bethel Group Home's records?
23     A.  Well, unless a person -- I mean, from
24 what I'm gathering, unless a person has direct
25 knowledge that they are the one that filled out the

Page 240

1  form, and they rec -- they know their own
2  handwriting, I mean, yeah. I mean, what happened at
3  various -- I mean, you have to understand that
4  counselors -- youth counselors, they had access to
5  about everything, including personnel files. If
6  personnel files -- if they were in a file cabinet,
7  if they weren't -- if that file cabinet, you know,
8  wasn't locked up, that, you know, I mean, they
9  could -- they could access, you know, personnel
10 records, unless, you know, whoever had been in that
11 office last, you know, presumably the business
12 manager who functioned as the personnel director,
13 had locked it up.
14         So -- and the vendor files were
15 never locked up.
16     Q.  Well, do you have any reason to think
17 that these three documents that we have just been
18 talking about -- 7, 8A, and 8B -- are not records of
19 the Bethel Group Home?
20         MR. FAYETTE: Wait. Objection.
21 Compound question. Foundation. Form. Go ahead.
22     Q.  Do you have any reason to not believe
23 the accuracy of these documents, Mr. --
24     A.  Yes.
25     Q.  And what's your reason?

Page 241

1      A.  Well, I never saw that one from
2  Alexander, that -- I don't think that that's the
3  correct date, if he did mail it in. I mean, if he
4  followed my instructions, my instructions -- I mean,
5  he didn't mail it in on the 17th. That's not a
6  correct date. If he mailed it in, it was, you know,
7  a week or ten days after, you know, whatever -- she
8  went into the hospital, and it was after that time
9  that he mailed it in. He wouldn't have mailed it in
10 ahead of time before I told him to do something.
11         And the application, those
12 checkmarks on there are phony, or they are not --
13 they are not -- they are inconsistent with the other
14 Xs.
15     Q.  You are talking about the waiver of
16 coverage section?
17     A.  Yes. Yes.
18         MR. FAYETTE: I'm going to pose an
19 objection to the answer. Lack of personal
20 knowledge. To the extent it's opinion, I suppose --
21     A.  Well, you can see they are not -- they
22 don't match the Xs. I mean, that's real -- that's
23 plain as day.
24     Q.  Okay.
25     A.  So, I mean, I'm sorry. I never saw that

Page 242

1  before.
2          MR. FAYETTE: And so to clarify my
3  objection, your question called for an opinion.
4  He's offered you his opinion. So whether or not
5  that is admissible is a question for a different
6  day.
7      A.  I mean, I agree with you.
8          MR. FAYETTE: Wait for the next
9  question.
10         THE WITNESS: Okay.
11     Q.  I want to be sure I understand your
12 testimony correctly here, Mr. Janowiec. Do you
13 think that the reason that Melissa Virtue's medical
14 bills were not being paid by the group home's
15 insurance company was because her enrollment form
16 was sent in after she got sick?
17     A.  Yes.
18         MR. FAYETTE: Object to the form.
19 Go ahead and answer.
20     A.  Yes. I mean --
21     Q.  That's your answer.
22     A.  Right. Because I had never seen those
23 marks, checkmarks on the waiver, and we only -- we
24 heard from Myron. I mean, we only heard --
25     Q.  Thank you.

62 (Pages 239 to 242)

Page 243

1  A. Right.
2  Q. I'm not interested in Myron. And the
3  enrollment form was not sent in prior to her getting
4  sick because that form was in your office?
5  A. I don't know --
6      MR. FAYETTE: Objection. Objection
7  to form. Go ahead and answer.
8  A. I don't know what day she entered the
9  hospital. I mean, I have asked you that several
10 times.
11 Q. Yeah.
12 A. Okay? I mean, I -- I think that it was
13 that -- you know, it sat on my desk, you know,
14 during, you know, the first couple days that she was
15 sick. She was in the hospital.
16 Q. Okay. You don't know what day she went
17 in the hospital, but you know that that form was in
18 your office or did not leave your office until after
19 she was sick?
20 A. Yeah. Because I remember that the form
21 was on my desk and -- and knowing and hearing that
22 she had gotten sick. And I knew what that meant. I
23 knew that she wasn't going to get insurance.
24 Q. Okay. So from that point on you
25 believed she was not going to get insurance?

Page 244

1  A. No. No.
2  Q. And --
3  A. And whether -- whether Alexander sent it
4  in really was -- was, you know, beside the point.
5  Q. And you never contacted Starmark to see
6  if she still might be eligible?
7  A. No. No. Of course not. No, I didn't.
8  Q. Because she had been your employee at
9  the time she got sick, right?
10 A. Yeah.
11 Q. And it was after her 90 days of
12 employment that she got sick, right?
13     MR. FAYETTE: Objection to the
14 form. Go ahead and answer.
15 A. Yes. It was after her 90 days. But --
16 okay.
17     MR. COOKE: For the record, I don't
18 have any further questions at this time. I don't
19 know if you do, Mr. Fayette, but just to
20 reiterate --
21     MR. FAYETTE: I don't. But if you
22 want to recap --
23     MR. COOKE: Just to reiterate our
24 earlier understanding that we are not closing this
25 deposition. We are, in effect, recessing it because

Page 245

1  we reserve the right to continue as to documents
2  that may be subsequently produced based on what we
3  have learned during the deposition about the
4  existence of such documents, including the large
5  notebook that was delivered to counsel today.
6      MR. FAYETTE: I think you have
7  accurately stated our understanding.
8      MR. COOKE: Okay.
9      MR. FAYETTE: I don't have anything
10 else to put on the record.
11     MR. COOKE: Thank you,
12 Mr. Janowiec. I know it has been a long day.
13     THE REPORTER: This will conclude
14 the deposition. It's 4:03 p.m. End of videotape
15 number 3. Off record.
16     (Deposition concluded at 4:03 p.m.)

Page 246

AFFIDAVIT

STATE OF ALASKA  )
                 ) ss.
FIRST JUDICIAL DISTRICT )

I have read my within deposition, and the same is true
and correct save and except any CORRECTIONS as noted on
the CORRECTIONS PAGE immediately following, attached hereto
and made part of this deposition transcript.

_____
PAUL JANOWIEC

SIGNED AND SWORN TO before me this
_____ day of _____, 2004.

_____
Notary Public.
My commission expires:
_____

63 (Pages 243 to 246)